M. Curt MELTZER, Plaintiff,

v.

CRESCENT LEASEHOLDS, LTD., John G. Bennett, A. Gordon Bennett, the Royal Trust Company, Wachovia Bank and Trust Company, the Bank of Montreal and Albert Gareh, Defendants.

No. 68 Civ. 1516.

United States District Court, S. D. New York.

June 11, 1970.

Daniel H. Greenberg, New York City, for plaintiff.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendants Crescent

Leaseholds, Ltd., John G. Bennett and A. Gordon Bennett; Peter K. Leisure, New York City, of counsel.

Isidore Sapir, New York City, for defendant Gareh.

MANSFIELD, District Judge.

In this diversity suit for recovery of $280,000 allegedly due as a brokerage commission or finder's fee, the remaining defendants, Crescent Leaseholds, Ltd. ("Crescent"), John G. Bennett and A. Gordon Bennett, move pursuant to Rule 56, F.R.Civ.P., for summary judgment dismissing plaintiff's claim against them (First Claim of Complaint). The claim alleges that on August 10, 1967, plaintiff entered into a written agreement with Crescent whereby it employed plaintiff to obtain a $7 million loan for a period of 27 months at 8% to be used for interim financing of the construction of a shopping center in Saskatoon, Saskatchewan, for which plaintiff was to receive a fee or commission of 4% of the amount of the loan commitment. It is further alleged that plaintiff obtained a commitment for $7 million from a ready, willing and able lender and that defendant Crescent and the Bennetts, officers and directors of Crescent, failed and refused to perform the agreement and to accept the loan obtained by plaintiff.

Summary judgment has already been granted by other members of this court against plaintiff as to all other claims asserted in the complaint. For the reasons stated below, summary judgment is also granted as to this sole remaining claim.

Defendant Crescent, a Canadian corporation, is the owner of leases covering a tract of land in Saskatoon, upon which it is in the process of constructing a shopping center and office building complex. In 1965 and 1966 it obtained permanent financing for the completed project. Pending completion, however, it needed interim bank loans to finance construction of the complex. Partial inter-

im financing was to be obtained through Canadian sources. One of the lenders, The Royal Trust Company, a Canadian corporation, was willing to form a consortium to secure interim financing and to act as trustee for the consortium to supervise the distribution to Crescent of the interim loans that would be extended.

However, by 1967 Crescent was having difficulty obtaining the balance of its interim financing requirements because of the tight money market. For instance, negotiations with one prospective lender, Wachovia Bank and Trust Company, were suspended on June 27, 1967, because of the onerous terms demanded by it, which included not only the usual construction and building loan agreement secured by a mortgage on the premises but also signed leases from prospective tenants.

In early August 1967, plaintiff, a New York attorney, indicated that he might be able to obtain the $7 million interim financing for Crescent. When defendants exhibited an interest he turned for help to one Albert Gareh (named as a defendant in this action), the president of Pan American Credit Corporation, a New York company engaged in arranging international money transactions. Gareh believed that, in view of the tight money market in the United States, he would be in a position through sources in Europe to obtain American money located in Europe (called "Eurodollars") for deposit with a bank in the United States at interest rates lower than those charged by American banks, and that upon such deposit the American bank, armed with the dollar balance, would lend it to Crescent at a higher rate than that paid to the European depositor upon its certificate of deposit, thereby realizing the difference in the interest rates as profit. It is not clear from the papers whether the American bank would issue the loan commitment to Crescent, thereby extending its own credit to the borrower or simply act as an administrator of the loan.[1] For our purposes, how-

---

1. Plaintiff contends in substance that Ufitec agreed to loan the $7 million to finance the construction and to assume the risk of being repaid solely upon the

ever, it is unnecessary to resolve that question, since the record is clear that regardless which form the loan took, it was to be secured by a mortgage on the leasehold and premises to be constructed with the proceeds.

When Gareh indicated an interest, he and plaintiff negotiated a series of written agreements with the Bennetts whereby plaintiff and Gareh would undertake to obtain the $7 million interim construction loan commitment for Crescent. By letter agreement dated August 10, 1967, signed by plaintiff and Crescent, plaintiff was authorized to apply to lending institutions for a $7 million, 27-month "construction loan on the subject property (described as "Midtown Plaza, Saskatoon, Saskatchewan, Canada") with interest not to exceed 8% per annum "if our personal and corporate credit will stand against certificates of deposit of any major Canadian bank or The Royal Trust Company," Crescent agreed to make available "whatever documents [are] necessary to satisfy the requirements of the lending institutions to whom you make application on our behalf." For his services in obtaining the loan commitment plaintiff was to be paid 4% of the amount of the commitment upon its delivery to Crescent. The agreement was to remain in force for 45 days, i. e., until September 25, 1967.

Plaintiff simultaneously entered into a separate letter agreement with Gareh, also dated August 10, 1967, in which he exclusively authorized Gareh "to secure the construction loan requested by Crescent Leaseholds, Ltd. of Canada for the project known as Midtown Plaza in Saskatoon," for which Gareh was to be paid 2% of the gross amount of the loan

commitment. On the same date Crescent also entered into a letter agreement directly with Gareh to the effect that upon delivery of the loan commitment Crescent would pay 2% of the commitment to Gareh. Crescent also agreed to pay Gareh's out-of-pocket expenses up to $3,-000.

On August 22, 1967, Crescent and Gareh entered into a more formal written agreement which provided that Gareh would obtain for Crescent a $7 million loan "from a recognized banking institution acceptable to Crescent" so that construction of the Midtown Plaza on Crescent's leasehold might be financed. The contract also provided that Crescent, before it would accept the commitment, had to have made an arrangement with The Royal Trust Company of Canada and others for their extension through a trust arrangement of an additional temporary construction loan of $8.5 million. The parties also agreed that any dispute arising under the August 22 agreement "shall be construed under the laws of the State of New York where it was executed."

By letter agreements dated August 23, 1967, and September 27, 1967, the underlying letter agreements of August 10, 1967, were extended, including the "assignment" of plaintiff's August 10, 1967 agreement to Gareh, until January 28, 1968.

With this background of the formal agreements between the parties, we turn to the activities undertaken pursuant to them. Following the August 10, 1967 agreement Ufitec, S.A., a Swiss bank which had acted as a correspondent with Gareh's New York company, Pan American Credit Corporation, advised Gareh

personal obligation of defendants, with the domestic or Canadian bank acting merely as a conduit. However, the two letters from Ufitec to Gareh, dated August 23, 1967 (Plf's Ex. 33) and November 17, 1967 (Plf's Ex. 34), indicate that the Swiss bank was merely agreeing to extend $7 million credit to one of several substantial American or Canadian banks, each of which undoubtedly enjoyed a triple A rating and was good for repay-

ment, against the latter's letter of credit, at rates ranging from 6¼% to 7¼%, depending on the length of the loan period. In such event the domestic or Canadian bank, rather than Ufitec, would make the commitment to Crescent and assume the risk of its failure to repay. However, the grounds upon which we decide this motion make it unnecessary for us to determine the issue.

that it would be willing to deposit $7 million by way of a letter of credit with the Bank of Montreal or Fidelity Philadelphia Trust Company to enable Gareh, in turn, to negotiate the interim construction loan being syndicated by The Royal Trust Company. Interest rates of from 6¼% to 7%, depending on the period of the loan, were quoted.

Armed with the apparent willingness of the Swiss bank to make Eurodollars available, plaintiff and Gareh made attempts to complete the second essential step of the proposed loan, which was to find an American bank that would, upon deposit of the $7 million, be willing to make a loan commitment to Crescent at 8% or act as the administrator of the loan, obtain and verify the necessary security to be furnished which included a mortgage and other assignments. Toward this purpose plaintiff and Gareh approached various banks in the United States and made visits to The Royal Trust Company in Toronto and the Bank of Montreal in Montreal. The necessity for obtaining adequate security from the borrower, including a mortgage on the leasehold and premises to be constructed, is illustrated by a "List of Documents Required Prior to Conclusion of Loan," which was submitted by plaintiff and Gareh to The Royal Trust Company, the proposed manager of the consortium in October 1967. The first item on that list was "The mortgage." Also listed were "Title insurance policy," "The ground lease," "The Eaton lease," and "Assignment of Crescent Leaseholds shares to Royal."

Although Gareh's Swiss correspondent was apparently willing to deposit $7 million with an American bank which would then lend that money to Crescent upon receipt of security by The Royal Trust Company, plaintiff and Gareh were unsuccessful in inducing any American or Canadian bank to enter into the venture, either by way of a loan commitment or supervision of the loan and security. Thus they failed, during the period when their agreement with Crescent was in force, to meet all of the essential requirements for obtaining a loan commitment that would entitle them to their respective commissions.

On January 22, 1968, six days before the agreements were to terminate, Gareh "reassigned" to Meltzer all of the rights and interest which Meltzer and Crescent had assigned and delegated to him in the August 10, August 22, and extension agreements. The reason for this is disputed. Meltzer contends that his contract with Crescent provided for an exclusive brokerage arrangement and that Crescent had anticipatorily breached this part of the contract when it apparently negotiated for the loan independent of Meltzer in the latter part of 1967 (cf. Gareh Dep. at 14). When Gareh learned of this he believed that there was no reason to continue his efforts and, uninterested in pressing any rights he might have, decided to reassign his interests to Meltzer (Gareh Dep. at 142–47). In contrast, Crescent argues that after the authorization ended on January 28, it reopened negotiations for the loan with Wachovia Bank and Trust Company of Winston-Salem, North Carolina, a bank with which it had had unsuccessfully negotiated before the contract with Meltzer. The loan was secured from Wachovia on September 27, 1968.

Crescent now moves on two grounds for summary judgment of Meltzer's claim that Crescent breached the August 10th agreement. First, Crescent argues that plaintiff is prohibited by § 440–a of the New York Property Law, McKinney's Consol.Laws, c. 50 from recovering the commission claimed, regardless whether he has completed his contractual obligation, for the reason that although plaintiff as an attorney was not required to be licensed as a real estate broker (§ 442–f), Gareh, his co-broker, was not licensed as required by New York law. Second, Crescent contends that Meltzer and Gareh failed to obtain a loan commitment and are thus not entitled to the commission for failure to perform their obligation.

■■ Summary judgment, of course, can be granted only if no genuine issue

of material fact is in dispute. Chappel & Co. v. Frankel, 367 F.2d 197 (2d Cir. 1966); Engl v. Aetna Life Ins. Co., 139 F.2d 469 (2d Cir. 1943); 6 J. Moore, Federal Practice ¶ 56.04[1] (2d ed. 1966); F. James, Civil Procedure 230–31 (1965). If such an issue exists, and all inferences must be drawn in favor of the party opposing the motion, United States v. Diebold, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); American Mfrs. M. I. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1967), then the motion must be denied.

Section 440–a of the New York Real Property Law provides that

"No person, co-partnership or corporation shall engage in or follow the business or occupation of, or hold himself or itself out or act temporarily or otherwise as a real estate broker or real estate salesman in this state without first procuring a license therefor as provided in this article. * * *"

A "real estate broker" is defined in § 440, in part, as:

"Any person, firm or corporation, who, for another and for a fee, commission or other valuable consideration * * offers or attempts to negotiate, a loan secured or to be secured by a mortgage or other incumbrance upon or transfer of real estate. * * *"

A "real estate salesman" is defined in part as:

" * * * a person employed by a licensed real estate broker to list for sale * * * real estate * * * or to negotiate a loan or real estate * * *."

And § 442–d states in part that

"No person * * * shall bring * · * * an action * * * for the recovery of compensation for services rendered * * * in the buying, selling * * * [of] real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman."

An unlicensed real estate broker or salesman thus cannot collect a commission. The same is also true for a licensed broker if—as in the case here—his co-broker or salesman is unlicensed, Brandenburger & Marx, Inc. v. Heimberg, 34 N.Y.S.2d 935 (Munc.Ct.1942); Meyers v. Suffin, 203 N.Y.S. 103 (Sup. App. Term 1st Dep't 1924), or the only interest possessed by the licensed broker was the fruit of services rendered by the unlicensed broker. Siegel v. Henry Fippinger, Inc., 264 App.Div. 203, 34 N.Y.S.2d 894 (1st Dep't 1942). The participation of the unlicensed broker or salesman as a substantial factor in effectuating the transaction renders it unlawful.

The record here is conclusive that plaintiff and Gareh acted as co-brokers in attempting to obtain a mortgage loan commitment for Crescent. Plaintiff himself concedes under oath that pursuant to his "assignment" to Gareh of his interest in the August 10, 1967 agreement with Crescent

"[D]efendant Gareh was 'exclusively authorized' by me to act as a co-finder or co-broker in this lending transaction and that the total 4% commission to be paid by the borrowers was to be divided equally between us."

Gareh likewise describes Meltzer as "my partner in the transaction" (Gareh Dep. at 59). Furthermore, plaintiff's claim to a commission depends, as in *Siegel* and *Meyers, supra,* upon the efforts of Gareh through whom the $7 million in Eurodollars was to be obtained from Ufitec, Gareh's Swiss correspondent bank.

Applying New York choice of law rules, as we are required to do under Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), it is clear that the legality of the transaction is governed by New York law. A review of the parties' "contacts" under the "center of gravity" test prescribed by Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 989 (1954), reveals the most significant contacts to have been in New

York. Plaintiff is a domiciliary of New York. The contracts under review were negotiated and signed by the parties here. Gareh, although an Israeli citizen with a residence in Canada, also maintained a residence in New York City and was president of Pan American Credit Corporation, a New York corporation having its place of business in New York City, through which he acted to obtain the indication from its Swiss correspondent bank that it might be willing to deposit $7 million to finance the transaction. Furthermore, the only *non*-New York citizens who were parties to the agreement, Crescent and Gareh, expressly provided in ¶ 6 of their August 22, 1967, agreement that New York law would control in disputes that arose, thus indicating a clear intent to be governed by such law. The choice of the parties, so long as it bears some reasonable relationship to the forum chosen, usually controls. B. M. Heed, Inc. v. West India Mash. & Supply Co., 272 F.Supp. 236 (S.D.N.Y.1967).

As a New York domiciliary, plaintiff offers little to support his belated contention that some other law should govern. The fact that the real estate was located in Saskatchewan, and that various Canadian parties were involved would not in the face of the above enumerated factors tip the considerations in favor of some other law, such as the law of Saskatchewan, Ontario or Quebec. None of the latter jurisdictions had as much contact with the transaction as did New York. In similar situations New York courts have uniformly applied the New York law. See J. L. Kislak, Inc. v. Carol Management Corp., 7 A.D.2d 428, 184 N.Y.S.2d 315, appeal denied, 8 A.D. 2d 698, 185 N.Y.S.2d 745, appeal dismissed, 7 N.Y.2d 719, 193 N.Y.S.2d 456, 162 N.E.2d 636 (1959) (land involved located outside of New York); Gartrell v. Jennings, 283 App.Div. 879, 129 N.Y. S.2d 583 (2d Dep't 1954) (plaintiff not a resident and land located outside state); Bitterman v. Schulman, 265 App.

Div. 486, 39 N.Y.S.2d 495 (1st Dep't 1943) (land located outside state; place of execution crucial); Baird v. Hine, 253 App.Div. 65, 300 N.Y.S. 1171 (3d Dep't 1937) (defendant and plaintiff resided outside community wherein licensing required); Copellman v. Rabinowitz, 208 Misc. 274, 143 N.Y.S.2d 496 (City Ct. 1955) (land located outside state).

In any event there appears to be no conflict between New York law and the law of Saskatchewan, the jurisdiction in which the shopping center will be located. Sections 2(a), (i), (j) and (m) of the Saskatchewan Revised Statutes, Ch. 329 (1965), which we consider pursuant to Rule 44.1, F.R.Civ.P., set forth definitions similar to those in § 440. Section 3 requires that a real estate broker or agent be licensed, and § 30 precludes maintenance of an "action * * * for commission or for remuneration for services in connection with a trade in real estate unless at the time of rendering the services the person bringing the action was licensed as an agent * *."

In an effort to avoid § 440–a et seq. of New York's Real Property Law, plaintiff next contends that Gareh need not have been licensed because no real estate mortgage was contemplated by the parties. Although the initial August 10, 1967, agreement between plaintiff and Crescent authorized plaintiff to obtain the loan "if our personal and corporate credit will stand against certificates of deposit of any major Canadian bank or The Royal Trust Company," other proof is overwhelming and conclusive that the $7 million loan was to be secured by a real estate mortgage upon the Midtown Plaza ground lease, leasehold and improvements. Paragraph 4 of the same agreement, by referring to "the vesting of title" and the "recordation of such loan," so indicates. Furthermore, Gareh, plaintiff's co-broker, has repeatedly testified that an essential element of the proposed loan was the furnishing of a "mortgage" upon the premises.[2] Plain-

2. "[W]hen Mr. Meltzer came to me, there was a money, tight money market, and

for mortgages and money companies did not go for mortgages because simply

tiff, in a letter dated January 3, 1968, to defendant John Bennett complaining of the latter's dealings with Wachovia, summarized the agreement and transaction as follows:

> "I need not remind you that we have a firm contract covering my exclusive authority to obtain a construction loan for Midtown Plaza. To that end I brought you a source of funds, namely *Albert Gareh and his Associates who were working on arrangements to close the mortgage loan.* However, your current dealings with Wachovia have precluded my concluding said arrangements." (Emphasis added)

The necessity for a mortgage was further illustrated by the letter of H. T. Tucker of The Royal Trust Company, dated October 17, 1967, signed by him in his capacity as "Manager, Mortgage Development," to John Bennett with a copy to plaintiff enclosing the "List of Documents Required Prior to Conclusion of Loan," quoted *supra*, which included the "mortgage," "title insurance policy," "the ground leases."[3] Defendants have

likewise given testimony confirming that the transaction was predicated on Crescent's mortgaging its leasehold and improvements. Indeed, it would be unlikely that a lender, whether it be a Swiss, domestic or Canadian bank, would extend a $7 milion construction loan to Crescent without requiring adequate security, which customarily includes a mortgage on the real estate and improvement which are the subject of the construction loan. In fact the draft agreements prepared in early 1967, when Wachovia was intended as one of the interim lenders, expressly provided:

> "2. Security for the Loan 2.1. The Mortgage. The Loan shall be secured primarily by three or more mortgages (collectively, the 'Mortgage'), to be made by the Company to Royal in form appropriate under the law of Saskatchewan and satisfactory to the parties hereto, of the Project (including, without limitation, the Ground Lease, the leasehold estate of the Company constituted by the Ground Lease and the Improvements to the extent construed from time to time, providing

they didn't have the money for construction loan, so my theory was to bring the $7 million, which we did at that time, in, in one or two cases, to put it either Wachovia or Fidelity of Philadelphia, or the Bank of North America, who are—who are willing to take the mortgage of $7 million against $7 million which we are placing from Europe in the bank.

\* \* \* \* \*

"A The Fidelity.
"Q Or the Fidelity Bank of Philadelphia, would make this loan and supervise it simply because you would have placed in the hands of that bank the $7 million from Ufitec of Zurich with which the entire transaction could be completed?
"A Yes." [Gareh Dep. at 50–51]
"Q Now, was this Fidelity International Corporation the vehicle for the placing of the funds from Ufitec into an American bank which would disperse the loan?
"A No, sir.
"Q What were they?
"A Fidelity, they have their mortgage departments.
The Fidelity Bank, Fidelity of Philadelphia Bank, they have their mortgage

departments and we have suggested that we are giving you the $7 million and you take the rest with the Royal Trust in supervising the mortgage at a rate for you at three or four per cent for you." [Gareh Dep. at 80]
"Q I come back again to my fundamental question. The money was not actually being loaned by Wachovia; is that right?
"A That is the intention of our approach to Wachovia, that we shall supply them the money at a cheap rate from Europe against their certificate of deposit, then against a fee they will take over to service the mortgage." [Gareh Dep. at 111]

3. Plaintiff's attempt to explain the mortgage instruments as referring only to the permanent financing of the completed project, to be furnished by Massachusetts Mutual Life Insurance Company and Northwestern Mutual Life Insurance Company, is baseless. It is clear beyond any doubt that a mortgage of the premises was also required to secure the interim financing.

that there shall be no priority of any of such mortgages over any of the others notwithstanding their actual order of execution, delivery and registration, that default under any of them shall be deemed to be default under all of them, that payment of the entire Loan shall be immediately due in the event of a sale or other disposal of the Project or any part thereof by the Company without the prior consent in writing of Royal and (without limitation of the foregoing) generally containing all such provisions as Royal's counsel consider necessary or desirable to ensure that enforcement of and realization upon the security for the Loan shall occur as if only one mortgage constituted the Mortgage, it being anticipated further that the Mortgage will be also in such form as will, after amendment at the material time, satisfy the requirements of Mass Mutual's commitment and, as amended, be capable of transfer to Mass Mutual, all as hereinafter provided.

"2.2. Covenants and Guarantees of the Mortgage. Without limiting the generality of the foregoing Section 2.1, the Mortgage shall contain the direct, unconditional covenant and obligation of the Company to pay all money (whether principal, interest, taxes or other money) thereby secured and in addition the direct and unconditional covenants and guarantees of John G. Bennett and A. Gordon Bennett and their respective wives.

"2.3. Collateral Security. The Loan shall be collaterally secured by assignment to Royal in form appropriate under the law of Saskatchewan and satisfactory to the parties hereto (considering, as anticipated by Section 2.1 hereof, in that connection the requirements of Mass Mutual's commitment) of leases of premises in the Project to at least the extent of the requirements of Mass Mutual's commitment and in any event including the Eaton Lease, the Simpsons-Sears Lease, and Safeway Lease and the CN Lease hereinafter mentioned."

Gareh testified that the foregoing trust agreement, which was shown to him and Meltzer, was the type that would be used to consummate the loan that he and Meltzer were to obtain for Crescent.

"Q Limiting yourself then to the proposed trust agreement, can you tell us, was this the form of trust agreement which was to be used in consummating the loan which was being made through you to Crescent Leaseholds, Ltd.

"A Yes, sir.

\*    \*    \*    \*    \*    \*

"Q Was it a pre-condition of your making this loan that a trust deed be signed by the borrower, Crescent Leaseholds, Ltd. so as to assure that the funds are properly dispersed once they were in the hands of Royal Trust Company?

"A Yes, sir."

(Gareh Dep. at 121, 123)

Thus from the very outset the primary security for the loan was to be the mortgage on Crescent's ground lease, leasehold estate and improvements on the premises to the extent constructed with the proceeds of the loan. This is revealed not only by the terms of the proposed "Trust Agreement" dated June 27, 1967, but also by the "Building Loan Agreement" ultimately executed on September 27, 1968, which described the mortgage as the security and referred to the assignments of Crescent's rights under its leases to tenants as "other security."

The proof is equally conclusive that Gareh, as co-broker, was engaged not only to seek Eurodollars but also to arrange for the essential agreement on the part of a domestic or Canadian bank relating to the mortgage, without which the proposed loan could not be consummated. Under Par. 1 of his written agreement with Crescent dated August 22, 1967, as amended on August 23, 1967, Gareh expressly agreed "to obtain for Crescent a commitment from a recognized banking institution acceptable to Crescent." Gareh has testified that the

"recognized banking institution" would not be Ufitec but would be "either Wachovia or Fidelity of Philadelphia or the Bank of North America" (Gareh Dep. at 75).

Furthermore, in his capacity as a co-broker Gareh engaged in extensive but unsuccessful efforts to induce an American or Canadian bank to agree to accept the mortgage and administer the loan. For instance, he attempted to collect the essential documentation, using the materials previously prepared in the course of direct negotiations between Crescent and Wachovia. He urged Royal Trust to ask Crescent to accelerate its delivery of the documents (Plf's Ex. 22 for iden.). He chose the three banks to approach, Wachovia, National Bank of North America, and Fidelity Bank of Philadelphia. He engaged a Mr. Arie Shapiro to present some documentation to Fidelity (Gareh Dep. at 79–89), and asked Royal Trust to inform him when the documentation which it was preparing would be ready to present to Wachovia (Gareh Dep. at 136).

Gareh's conduct convincingly demonstrates that his activities to obtain the real estate mortgage was a principal part of the entire transaction. Since he was not licensed as a broker, the agreement and his activities thereunder violated § 440–a et seq. of the New York Real Property Law and plaintiff is precluded by § 442–d from recovery of any commission on the transaction.

We recognize that strict application of § 440–a et seq. might in some cases preclude recovery by a broker even though he or his unlicensed co-broker had been instrumental in successfully bringing about the consummation of a real estate transaction of mutual benefit to the parties. Whatever our reservations might be as to such harsh application of the law—and we are far from intimating here that plaintiff could establish his claim—we are bound by the fact that New York law on the subject is unequivocal and is given full force and effect by New York state courts. In fact compliance with § 442–d, which prohibits

the unlicensed broker from collecting his commission, is mandatory. Strout Realty v. Phillipson, 49 Misc.2d 435, 267 N.Y.S. 2d 752 (Sup.Ct.1966); Seckendorff v. Halsey, Stuart & Co., 135 Misc. 241, 237 N.Y.S. 50, reversed on other grounds, 229 App.Div. 318, 241 N.Y.S. 300 (1st Dep't 1930).

The salutary purpose of the statutory scheme also inclines us to apply it here. The New York Court of Appeals, in discussing § 441–b, a section related to § 442–d, said:

" 'The intrinsic nature of the business [real estate] combines with practice and tradition to attest the need for regulation. The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost. * * *.'

"Again it was said in Bendell v. De Dominicis, * * * 251 N.Y. 305, 310, 167 N.E. 452, 453 (1929): 'One purpose of the statute [§ 440, et seq., including § 442–d] was to mark off the business of the broker as distinct from occupations which by general acquiescence are pursued of common right without regulation or restriction,' and to make illegal the acts of the unlicensed in the real estate broker's field. (Roman v. Lobe, 243 N.Y. 51, 152 N.E. 461).

"These and other decisions are clear that the animating purpose of imposing this sanction on obtaining a real estate broker's license is the protection of the public, as in the case of licensing a lawyer or doctor * * *." (Galbreath-Ruffin Corp. v. 40th and 3rd Corp., 19 N.Y.2d 354, 362, 280 N.Y.S.2d 126, 130–131, 227 N.E.2d 30, 33 (1967) (some citations omitted)).

The purpose of § 442–d is "to protect dealers in real estate from unlicensed persons who acted as brokers, and to protect the public from inept, inexperi-

enced or dishonest persons who might perpetrate or aid in the preparation of frauds upon it, and to establish protective or qualifying standards to that end." Dodge v. Richmond, 5 A.D.2d 593, 595, 173 N.Y.S.2d 786, 787, 787–789 (1st Dep't 1958); Reiter v. Greenberg, 27 Misc.2d 18, 210 N.Y.S.2d 899 (Sup.Ct. Kings Co. 1961), aff'd, 18 A.D.2d 1093, 239 N.Y.S.2d 620 (2d Dep't 1963).

Moreover, New York is not alone in imposing such strict regulations upon real estate brokers and salesmen. The following states all have statutes similar to § 440 et seq. prohibiting recovery in certain situations to unlicensed brokers or agents: California (see, Weber v. Tonini, 151 Cal.App.2d 168, 311 P.2d 132 (1957)); Florida (Newcomer v. Rizzo, 163 So.2d 312 (Fla.App. 1964)); Maryland (Thorpe v. Carte, 252 Md. 523, 250 A.2d 618 (1969)); Missouri (Miller Nationwide Real Estate Corp. v. Sikeston Motel Corp., 418 S.W.2d 173 (Mo.Sup.Ct. 1967)); Montana (Wheaton v. Ramsey, 92 Idaho 33, 436 P.2d 248 (1968) (applying Montana law)); Nevada (Davis v. Jouganatos, 81 Nev. 333, 402 P.2d 985 (Sup.Ct. 1965)); Ohio (Frieman v. Greaves, 80 Ohio App. 341, 74 N.E.2d 860 (Ct.App.1947)); Texas (Wasson v. Hartt, 244 S.W.2d 258 (Tex.Civ.App. 1951)); Wisconsin (Payne v. Volkman, 183 Wis. 412, 198 N.W. 438 (Sup.Ct. 1924)). See, generally, 8 A.L.R.3d 523 (1966); 12 Am.Jur.2d "Brokers," § 180 (1964); 6 N.Y.Jur. "Brokers," § 98 (1959).

Turning to the second ground urged by defendants, there is no question about the fact that plaintiff and Gareh did not obtain the mortgage loan commitment. Although Ufitec indicated that it might be willing to make the $7 million in Eurodollars available by letter of credit to a domestic or Canadian bank against that bank's certificate of deposit, which could then be used to finance the loan, there remained as an essential condition precedent the negotiation of mutually satisfactory arrangements to secure the loan through a mortgage of the leasehold, ground lease and improvements and the other essential protective features evidenced by the demanding list attached to Plf's Ex. 22. It was the failure to meet these requirements that had prevented Crescent from successfully negotiating a loan from Wachovia in early 1967 and led to Crescent's August agreement to retain plaintiff and Gareh to obtain the loan. Plaintiff likewise failed to solve this essential problem by obtaining a domestic or Canadian bank that would become a party to the transaction upon mutually satisfactory mortgage and security terms. As a result, no mortgage loan was consummated within the period of the agreement between the parties.

Plaintiff contends that defendants prevented him and Gareh from successfully consummating the loan by engaging in direct dealings with Wachovia which interfered with its pending negotiations with plaintiff and Gareh and by failing to provide the necessary documentation for the security. Both of these allegations are vigorously denied as sham by defendants. The latter point to the undisputed facts that their negotiations with Wachovia had been conducted at length long prior to plaintiff's coming into the picture and that plaintiff and Gareh approached Wachovia only after they had been unsuccessful in inducing other domestic or Canadian banks to participate in the transaction. Defendants also contend that they did nothing to prevent plaintiff and Gareh (through his representative Shapiro) from negotiating with Wachovia, notwithstanding defendants' earlier unsuccessful negotiations with it, and that defendants furnished promptly all documentation required successfully to consummate a mortgage loan. In short defendants contend that plaintiff's failure to perform was due solely to his and Gareh's inability to induce an American or Canadian bank to enter into the transaction on the terms proposed by plaintiff and Gareh. Although the evidence thus far adduced by the parties indicates that defendants would probably prevail upon this issue at trial, issues of fact are

presented which preclude us from granting the motion on this additional ground. Summary judgment dismissing plaintiff's claim to a commission on the transaction is granted, however, for the reason that Gareh, plaintiff's co-broker who played a principal part in negotiating the real estate mortgage loan transaction, was not licensed as a real estate broker.

It is so ordered.