**BALDT CORPORATION, Plaintiff,**

v.

**TABET MANUFACTURING CO., INC., Defendant.**

**No. 73 Civ. 661 (CHT).**

United States District Court, S. D. New York.

Dec. 24, 1974.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for plaintiff; Judith S. Kaye and Joseph C. Kaplan, New York City, of counsel.

Reavis & McGrath, New York City, for defendant; James R. Coley, Jr., New York City, of counsel.

## OPINION

TENNEY, District Judge.

This action is brought by Baldt Corporation ("Baldt"), a Delaware corporation, to recover the principal and interest allegedly due and owing on several notes issued by Tabet Manufacturing Company, Inc. ("Tabet"), a Virginia corporation. On July 7, 1971, Baldt sold its Palmer Electric and Manufacturing Division ("Palmer"), located in Saugus, Massachusetts, to Tabet, thereby giving rise to the obligations which are the subject of the controversy herein. This action, originally commenced in the Supreme Court of the State of New York through service on Tabet of a summons and motion for summary judgment in lieu of complaint pursuant to Section 3213 of the New York Civil Practice Law and Rules, was removed by defendant Tabet to the District Court for the Southern District of New York on the basis of diversity of citizenship, 28 U.S.C. § 1332. The case was tried to the Court without a jury.

### Facts

Baldt had acquired Palmer for approximately $2 million cash in October of 1969. Palmer is a manufacturer of shipboard electrical enclosures which are used to shield and protect electrical components from exposure to the elements at sea. Tabet and Palmer were at that time the prime competitors in this field.[1] Tabet wrote to Baldt in April of 1970 evidencing an interest in the purchase of Palmer, and preliminary negotiations followed. These negotiations produced no immediate result.

Palmer's business had been deteriorating steadily when, in the fall of 1970, Baldt made the corporate decision to sell Palmer to any buyer. Baldt originally sought to recoup its $2 million investment, but realized that this was not possible in light of the deteriorating state of the business of Palmer and subsequently revalued the business at $600,000. This revalued figure was made public early in 1971.

The negotiations between Baldt and Tabet appear to have resumed on a serious note when Mr. James Hollyer, then Executive Vice President of Baldt, flew to Norfolk, Virginia on July 1, 1971, to meet with Mike Tabet, the President, and Hughes Burton, the Vice President and General Manager, of Tabet. Tabet

---

1. Tr. at 7:
   "Q: At that time, Mr. Hollyer, who was [sic] your largest competitors?
   A: The larges[t] competitor was Tabet Manufacturing. There was a company called Nelson that competed to a somewhat lesser degree and also a company called Betts which went out of business roughly in that period."

was primarily interested in purchasing the machinery, equipment, and inventory of Palmer, as it had no intention of continuing the business in Massachusetts. The parties concluded a tentative Purchase and Sales Agreement ("Agreement") on this date at a price of $425,000, with Baldt to retain the land and buildings. The Agreement specified a $300,000 cash payment, with the balance of $125,000 to be paid in eight notes of $15,625 each.

Baldt was unwilling to dispose of Palmer's assets alone. Therefore, the Agreement included a provision for the assumption by Tabet of certain liabilities of Palmer. The Agreement had been negotiated in light of the May 31, 1971 balance sheet of Palmer, but was to be based on the June 30, 1971 closing figures. The relevant portion of the Agreement which embodies these features, Paragraph 2.3, reads as follows:

"2.3 The Palmer Assets generally described in Section 1 of this Agreement and the Palmer Liabilities generally described in Section 2 of this Agreement of Palmer and subject to the sale and assumption agreements and pursuant to the terms hereof are and will be set forth on a balance sheet of Palmer dated as at May 31, 1971, with such changes therein as shall occur subsequent to such date in the ordinary course of business, and the Seller shall sell, transfer, assign and deliver to the Company [Tabet], and the Company shall purchase, acquire and accept all of such assets as the same shall exist on the Closing Date other than the expressly excluded assets and shall assume all of such liabilities as the same shall exist on the Closing Date other than those expressly excluded liabilities. In the event that the 'Cash' and 'Accounts Receivable' of Palmer transferred to the Company do not equal or exceed the 'Accounts Payable' of Palmer as at June 30, 1971, then the difference between the 'Accounts Payable' of Palm-

er and the 'Cash' and 'Accounts Receivable' of Palmer as at such date shall be deducted from the principal amount due under the Notes in inverse order of their maturity. Such account shall be maintained in a manner consistent with that employed in the preparation of the May 31, 1971 balance sheet." [2]

The last two notes in the eight note series were made subject to set-off as provided in the Agreement. They were also made non-negotiable so that no third-party interest would be involved in the event of a set-off.

The parties met subsequently on July 6, 1971, in New York. Present at this meeting were Mr. Vincent Mastracco, Tabet's counsel, Mr. Ernest H. Lorch, Baldt's counsel, Mr. Burton, and Mr. Hollyer. Various changes in the documents were requested and made. Paragraph 2.3 of the Agreement was discussed at length and with apparent specificity, though no change was made in the Paragraph from the draft to the final form. Various other provisions were also discussed.[3] The meeting lasted approximately two and one-half hours. At its conclusion, the parties retired for a final review of the documents and for finalization of financing.

On July 7, the parties reconvened in New York to close the sale. Mr. Burton raised several questions concerning the various line entries on the May 31 balance sheet. Specifically, he wanted to have these entries broken down into their constituent elements so that he might know the exact composition of each. Mr. Hollyer explained these elements in some detail. The parties then reviewed and signed all documents and delivered the appropriate cash and notes. The sale was closed, as scheduled, on July 7, 1971.

The notes due on August 15, 1971, November 15, 1971, February 15, 1972, May 15, 1972, and August 15, 1972, were paid in full as was provided in the Agreement

---

**2.** Pl.'s Exh. 1, at 3–4.

**3.** Tr. at 33–34. The parties here discussed Paragraph 9.5 of the Agreement.

and are not the subject of the controversy herein.[4] Tabet, by letter dated November 15, 1972, submitted a check in the amount of $5,538.02 to Baldt. This check was purported to be in full and final payment of the notes due on November 15, 1972, February 15, 1973, and March 15, 1973.[5] Tabet explained this action by noting a variety of payments made on behalf of Baldt and attempted to justify the set-off by citing Paragraph 2.3. Tabet's reasoning, in essence, was that these payments were properly included within the term "Accounts Payable" as used in Paragraph 2.3 and, as such, caused an excess of "Accounts Payable" over "Cash" and "Accounts Receivable", thereby giving rise to the claimed set-off. Baldt contended that the charges did not fall within the bounds of the term "Accounts Payable" as it was used in Paragraph 2.3.

In response, Baldt's counsel, Mr. Lorch, wrote to Tabet on December 11, 1972, stating that Baldt considered the purported set-off to be improper and considered the note due on November 15, 1972, to be in default. Demand was made that the default be cured within five business days and the acceleration clause in the notes was cited. Finally, it was pointed out that the note due on November 15, 1972 contained no provision for set-off, as did the final two notes. In a follow-up letter, dated December 28, 1972, Baldt's counsel noted that the default on the November 15, 1972 note had not been cured and declared the remaining two notes to be immediately due and owing in accordance with the terms contained in each note. Demand was made for the payment of $46,875 plus interest within five business days. No payment was received by Baldt and the instant action followed.

## Issue

The sole issue before this Court is the interpretation of the term "Accounts Payable" contained in Paragraph 2.3 of the Agreement. Baldt alleges that the term refers only to the precise line entry on the Palmer balance sheets of May 31, 1971 and June 30, 1971, labeled "Accounts Payable". Tabet, on the other hand, alleges that the term refers to *actual* accounts payable or current liabilities assumed under the Agreement (Palmer Liabilities). Since the parties have stipulated as to damages, the determination of this issue will settle the controversy.

## Baldt's Allegations

Paragraph 2.3 was drafted by Baldt and it is Baldt's allegation that the use of quotation marks and capital letters around the words "Cash", "Accounts Receivable", and "Accounts Payable" was intended expressly for emphasis, to avoid ambiguity, and to alert any person reading the Agreement that these terms refer to the specific balance sheet line entries indicated. Baldt cites the apparent concurrence of the parties that the term "Cash" refers to the specific line entry on the Palmer balance sheet, as does the term "Accounts Receivable". Consistency, Baldt alleges, would dictate the same conclusion with regard to the term "Accounts Payable". Further evidence of this interpretation, Baldt maintains, can be seen from the final sentence in Paragraph 2.3 which reads: "Such account shall be maintained in a manner consistent with that employed in the preparation of the May 31 balance sheet."[6] Baldt then points to the fact that the term "Accounts Payable" is not used elsewhere in any of the documents pertaining to the transaction.

Baldt states that, from the first, it was bound by the revalued price of $600,000 which it felt it had to realize from the sale of Palmer. Baldt knew that Tabet did not intend to carry on the operation of Palmer in Massachusetts and estimated that it could realize $175,-

4. The parties have agreed that interest is still due and owing on these notes in the amount of $959.83.

5. See Exh. B and Exh. C appended to plaintiff's Notice of Motion for Summary Judgment in Lieu of Complaint.

6. Pl.'s Exh. 1, at 4.

000 from the sale of the land and buildings located at Saugus, Massachusetts. In order to gross $600,000 from the sale, Baldt had to realize $425,000 from the sale of the remaining assets of Palmer. Since Tabet was aware of the original purchase price of $2 million paid by Baldt for Palmer, Baldt reasons, Tabet must have clearly understood that the only way Baldt would sell Palmer at this vastly reduced price was to sell the entire business, excluding only the land and buildings at Saugus. Thus, Tabet would have to assume liabilities as well as assets.

The guarantee contained in Paragraph 2.3,[7] Baldt alleges, arose out of Mike Tabet's concern over three potential problem areas: (1) that cash coming into the business not be siphoned off; (2) that no undue purchases of materials take place, thereby creating excessive accounts payable; and (3) that all accounts receivable remain in the operating unit. In Baldt's view these were legitimate concerns, and it was out of these concerns that the guarantee contained in Paragraph 2.3 arose. To protect against unreasonable shifting in the balances of these accounts during the time span from May 31 to June 30, Baldt provided the equation contained in Paragraph 2.3 and added the set-off provisions in the last two notes to back it up. The fact that there was a $27,000 excess of "Cash" and "Accounts Receivable" over "Accounts Payable" at May 31 was of no concern, Baldt maintains, since the continual downtrend in the business would be expected to consume this excess and perhaps more.

It is plaintiff Baldt's position that Mr. Hollyer detailed the constituent elements of each of the balance sheet line entries for Tabet's representatives and, further, that Mr. Hollyer answered all questions

and supplied all information requested by Tabet. Specifically, Baldt contends that Mr. Hollyer evidenced the special attention which he gave to those items in Paragraph 2.3 by a mark on the draft which was his way of reminding himself of matters requiring special attention. Baldt concludes by stating that while many changes were made in the Agreement and while much discussion took place with regard to Paragraph 2.3, that Paragraph was unchanged from draft to final form.

*Tabet's Allegations*

Tabet maintains that it had no intention of continuing the business of Palmer in Massachusetts. Therefore, it had no need for the land and buildings of Palmer. Further, Tabet alleges that it had no interest in the soft assets (the cash, accounts receivable, etc.) of Palmer, but was only interested in the hard assets (the machinery, equipment, and inventory). In fact, the only assets valued in arriving at the purchase price of $425,000 were the hard assets. Tabet felt that $425,000 was its upper limit—no higher price could be justified in this instance. Tabet states that this was the top figure it was prepared to pay *to Baldt,* although it did envision other related expenses.

It is Tabet's contention that the assumption of the soft assets and the liabilities of Palmer was agreed to purely as an accommodation to Baldt. As such, Tabet would not have acquiesced if it had felt that this accommodation was going to cost anything over and above the $425,000 purchase price. This possibility, Tabet maintains, was its greatest concern.

It was Tabet's understanding that the term "Accounts Payable" as used in Paragraph 2.3 included the three current

---

**7.** Pl.'s Exh. 1, at 4:

"In the event that the 'Cash' and 'Accounts Receivable' of Palmer transferred to the Company do not equal or exceed the 'Accounts Payable' of Palmer as at June 30, 1971, then the difference between the 'Accounts Payable' of Palmer and the 'Cash' and 'Accounts Receivable' of Palmer as at such date shall be deducted from the principal amount due under the Notes in inverse order of their maturity."

liability line entries labeled "Accounts Payable", "Salaries, Wages and Other Compensation", and "Payroll Taxes and Payroll Withholdings". Employing this interpretation of "Accounts Payable", the equation employed in Paragraph 2.3, based on the balance sheet of May 31, would result in a "wash-out" with "Cash" and "Accounts Receivable" roughly equal to "Accounts Payable".[8] This interpretation, Tabet maintains, is fully consistent with its position that this accommodation not add any cost to the purchase price; and the provision for set-off in the last two notes was added expressly to protect against Tabet being harmed by any fluctuation from this "wash-out" situation. Tabet deemed this reserve of $31,250 to be adequate under these circumstances. Tabet cites three check marks placed on a copy of the May 31 balance sheet by Mr. Mastracco as evidence that this interpretation was mutually understood by the parties. These check marks were placed next to the three current liability line entries while Mr. Mastracco was questioning Mr. Hollyer regarding the elements included in Paragraph 2.3. Tabet concludes by stating that it was bound by the $425,000 ceiling going into the negotiation, and that it would have been impossible to adhere to this ceiling if it had been forced to make additional outlays of cash as a result of this accommodation of Baldt.

## Analysis

■ Where the jurisdiction of this Court arises in diversity, the interpretation of the contract and the rights thereunder depend on state law. *Merritt-Chapman & Scott Corp. v. Public Utility Dist. No. 2*, 237 F.Supp. 985 (S.D.N.Y. 1965). Here the parties have validly stipulated[9] that the law of the State of New York shall govern for all purposes in disputes arising under the Agreement. *Meltzer v. Crescent Leaseholds, Ltd.*, 315 F.Supp. 142 (S.D.N.Y.1970), *aff'd*, 442 F.2d 293 (2d Cir. 1971); *B. M. Heede, Inc. v. West India Machinery and Supply Co.*, 272 F.Supp. 236 (S.D.N.Y.1967).

■ The Agreement herein has been reduced to a writing and contains a valid integration clause.[10] Thus extrinsic evidence would not normally be admitted to alter or vary the terms of the written instrument. *Leumi-Financial Corp. v. Richter*, 17 N.Y.2d 166, 269 N.Y.S.2d 409, 216 N.E.2d 579 (1966); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). However, where an ambiguity is found to exist, parol evidence is admissible to resolve the ambiguity. *Nathan v. Monthly Review Press, Inc.*, 309 F.Supp. 130 (S.D.N.Y.1969); *Tramco Industries, Inc. v. Broad Hollow Associates*, 30 A.D.2d 522, 290 N.Y.S.2d 260 (1st Dep't 1968), *aff'd*, 23 N.Y.2d 841, 297 N.Y.S.2d 739, 245 N.E.2d 408 (1969). In a previous opinion in this case[11] denying plaintiff's motion for summary judgment, it was held that "the terms 'Accounts Payable' and 'Palmer Liabilities' are ambiguous and that a triable issue of fact exists."[12] Therefore, the admission of extrinsic evidence to cure this ambiguity is proper.

■ The Purchase and Sales Agreement was prepared by the Baldt people. Mr. Hollyer testified that it was his practice to use capital letters and quotation marks whenever he wanted to indicate the quotation of specific line entries

8. Pl.'s Exh. 3:

"Cash 20
Accounts Receivable 103
123

Accounts Payable 96
Salaries, Wages and
Other Compensation 20
Payroll Taxes and
Payroll Withholdings 5
121"

9. Pl.'s Exh. 1, at 16, Paragraph 9.9.

10. Pl.'s Exh. 1, at 14, Paragraph 9.5.

11. *Baldt Corporation v. Tabet Manufacturing Company, Inc.*, 73 Civ. 661 (S.D.N.Y., filed June 20, 1973).

12. *Id.* at 6.

from a statement. Mr. Burton admittedly noticed the capital letters and quotation marks used in Paragraph 2.3, but raised no question as to their usage. Nor did Mr. Burton question the fact that this usage and punctuation appears nowhere else in the documents, though once again he admitted his awareness of this fact. Similarly, Burton admitted at trial that he noticed the final sentence in Paragraph 2.3 referring to the maintenance of accounts, but once again he raised no question with regard to it.

Both plaintiff and defendant seem to agree that the terms "Cash" and "Accounts Receivable" as used in Paragraph 2.3 indicate the specific corresponding line entries on the May 31 and June 30 balance sheets. Absent evidence to the contrary, consistency would demand that the term "Accounts Payable" also indicate the corresponding balance sheet line entry. Tabet's contention that the term "Accounts Payable" includes not only the line entry "Accounts Payable", but also the line entries "Salaries, Wages and Other Compensation" and "Payroll Taxes and Payroll Withholdings" is not persuasive. There are a dozen line entries listed under Current Liabilities on these balance sheets. There is no plausible explanation nor rationale offered to explain why only these three entries and no others are to be included under the heading "Accounts Payable".

This Court finds that Tabet was well aware that Baldt was selling Palmer at a vastly reduced price. Also, implicit in Tabet's purchase was the removal of a prime competitor. The result of these factors was the placement of Baldt in the position of strength in the negotiation. Simply stated, Baldt was in a position to sell as much or as little of the business as it wanted and Baldt did, in fact, force Tabet to assume certain liabilities. This Court, however, is not convinced that the equation contained in Paragraph 2.3 derived from this bargaining situation nor that Paragraph 2.3 was the manifestation of any "accommodation" by Tabet. To the contrary, Baldt's theory is much more credible in light of

the facts disclosed. From the evidence presented this Court must conclude that Tabet was concerned about the shifting of funds and the undue purchase of materials prior to the closing, and that the equation found in Paragraph 2.3 was set up to protect Tabet against this eventuality. Both parties were well acquainted with the deteriorating state of the business of Palmer. Both parties knew or should have known that the $27,000 excess of "Cash" and "Accounts Receivable" over "Accounts Payable" would be eroded, if not entirely consumed, as the downtrend in Palmer's business continued. The set-off provisions in the last two notes were merely an added protection in case the downtrend further accelerated. Any "accommodation" claimed by Tabet was actually the result of Baldt's superior bargaining position and Baldt's insistence that liabilities, as well as assets, be assumed.

The conduct of the negotiations lends further weight to this interpretation. It is undisputed that Mr. Hollyer answered all questions posed by the Tabet people and complied fully with all of Tabet's requests for information. Both parties testified that the documents in question were discussed in detail and several changes were incorporated into them. It is notable, however, that while all of the relevant discussion regarding Paragraph 2.3 took place prior to the signing of the Agreement, thereby affording ample opportunity for amendment, the Paragraph was not altered in any way from draft to final form. Also notable is the absence of any testimony that any amendment was even *suggested*. As the Court stated at trial:

"I notice in the draft of July 6 there are quite a number of notations or changes. There is no change made with respect to this particular item [Paragraph 2.3] and it seems to me it would have been a very simple matter to be a little more specific, just like there was further specification on 2.3 on another part of the contract.

"This was a matter that was important to both sides and apparently Mr.

Hollyer made notations on the draft alongside of it with particular reference to the cash, accounts receivable and accounts payable and no change was made by anybody with respect to this." [13]

■ Mr. Hollyer testified that he made a "squiggle" in the margin of the Agreement next to Paragraph 2.3. This was his mark, his method of indicating to himself that he wanted to be sure to cover an area with emphasis in subsequent discussions. Mr. Hollyer was before the Court, was subject to cross-examination, and consequently his testimony must be given much weight. Mr. Burton, on the other hand, testified that Mr. Mastracco had placed check marks next to the three current liability line items on the May 31 balance sheet which Tabet contends were included in "Accounts Payable". Both of these marks—Hollyer's squiggle and Mastracco's check mark—are in themselves neither distinctive nor communicative. Mr. Hollyer was present to give testimony regarding the meaning of his mark. Mr. Mastracco, while still alive and still in the employ of Tabet, was not called to testify regarding the meaning of his mark. Consequently, Burton's testimony must be given relatively little weight.[14]

Finally, Burton testified that $425,000 was the absolute maximum that Tabet was willing to pay for Palmer. This being the case, it would have been a matter of relative ease to insert a simple clause fixing this upper limit, yet this was not done.

In conclusion, this Court is convinced that the term "Accounts Payable", as used in Paragraph 2.3 of the Agreement, refers to the current liability line entry also labeled "Accounts Payable" on the May 31 and June 30 balance sheets. The broader interpretation suggested by Tabet is without substantial force.

Accordingly, judgment is granted in favor of plaintiff as set forth in the Stipulation and Order signed in this Court on July 29, 1974, in the amount of $46,875.00 less an offset of $4,477.85, leaving a total of $42,397.25, plus (a) $959.83 as interest previously due, (b) $6,916.03 as interest on the principal due from August 15, 1972 until May 15, 1974, the last date upon which interest was computed, and (c) interest on the principal in the amount provided for in the notes from May 15, 1974 through the date judgment is entered herein.

So ordered.

---

13. Tr. at 73.

14. "The rule in respect of failure of a party to produce oral evidence is that such failure is a fact to be considered in determining how much weight, if any, should be given to the evidence which he has produced." *Reehil v. Fraas*, 129 App.Div. 563, 114 N.Y.S. 17 (2d Dep't 1908), *rev'd on other grounds*, 197 N.Y. 64, 90 N.E. 340 (1910).