HERMAN MILLER, INC., Plaintiff,

v.

THOM ROCK REALTY COMPANY, L.P., Defendant.

No. 92 Civ. 2125 (RWS).

United States District Court, S.D. New York.

April 22, 1994.

---

**912**

Sedgwick, Detert, Moran & Arnold, New York City (David M. Covey, Eric M. Kraus, Randi F. Altschuler, of counsel), for plaintiff.

Hutton Ingram Yuzek Gainen Carroll & Bertolotti, New York City (Dean Yuzek, David Ebert, of counsel), for defendant.

## OPINION

SWEET, District Judge.

In this diversity action the plaintiff Herman Miller, Inc. ("Herman Miller"), a tenant of the defendant Thom Rock Realty Company, L.P. ("Thom Rock"), sought to be relieved of its lease obligations to Thom Rock. Upon the facts and conclusions set forth below, relief will be granted to the extent of

reducing the lease term, and judgment will be entered in favor of Herman Miller with costs in accordance with this opinion.

The dispute which has given rise to this action has its origins in an ambitious plan to create an International Design Center in Queens, New York ("the Center") where the leading firms in the contract furniture industry could present their products to their industry. The Center failed to live up to the expectations of its promoters as a consequence of its location, the recession of the late 80's, and changes in the contract furniture industry and its practices. These forces compelled the landlord to rent space in the Center to tenants outside the contract furniture industry, an act upon which Herman Miller seized in an effort to get out of a lease it no longer wished to perform. The dispute has focused on a particular provision of the lease which provided that the landlord would provide a building "intended to be used for showrooms and other related uses." It is the significance of this language that controls the disposition of this action.

### Prior Proceedings

This action was commenced on March 25, 1992. Both parties were represented by skilled counsel with the happy consequence that the pretrial proceedings were executed with despatch and without unnecessary motion practice. Despite a good faith effort between the parties, it was not possible to settle the dispute which extends beyond the immediate parties involved, as the facts below will demonstrate, and may well be central to the survival of the Center.

A bench trial commenced on December 27, 1993 and was completed on January 24, 1994 after five days of testimony and an adjournment to accommodate witnesses. After final argument and briefing the action was considered finally submitted on April 11, 1994. Upon all the proceedings had herein, the following findings and conclusions are reached.

### THE FACTS

#### The Parties

Herman Miller is a Michigan corporation with its principal place of business at Byron Road, Zeeland, Michigan, and is a manufacturer, assembler and seller of contract furniture. Contract furniture manufacturers constitute that portion of the furniture business which manufactures, assembles and sells products for commercial users such as offices and hotels.

Herman Miller is highly sophisticated regarding the operation of its business and the interior design and contract furniture industry and is one of the leading contract furniture manufacturers in the country with respect to both volume of sales and design innovation.

Thom Rock, a developer and owner of real estate, is a New York limited partnership. Its principal place of business at the time the lease was signed was 666 Fifth Avenue, New York, New York. It owns the premises known as the International Design Center of New York (the "Center") which is located just over the Queensboro Bridge from Manhattan.

The Center is and has been operated and managed by the International Design Center, Inc. ("IDC"), a New York corporation with offices at 29–10 Thomson Avenue, Long Island City, New York. From 1983 through the present, IDC has acted as agent for and on behalf of Thom Rock.

### The Project

In 1981, Lazard Realty, Inc. began the rejuvenation of certain properties in the vicinity of Thomson Avenue and 47th Street in Long Island City in Queens, New York, intending to provide facilities for secondary or back-office purposes. This plan was abandoned by 1983 and instead a plan was conceived to develop the properties as a design center for the interior design industry. The new concept for these properties became known as the International Design Center of New York. A development plan was created by I.M. Pei & Partners on behalf of Lazard Realty, and the Thom Rock partnership was created to raise the capital needed for the project and as the ownership vehicle. At the time the plan was announced, it received considerable press coverage and was supported by New York City and State instrumentalities as, among other things, an effort

to extend the commercial activity of Manhattan to Queens.

In 1983, the plan, as set forth in an impressive brochure, called for the complete renovation of two existing vacant buildings. One was the former American Chicle building and was to be known as Center I; another was the former Bucilla building and was to be known as Center II. The renovation of a third partially vacant building, formerly the Executone building, was also planned. This building was to be known as Center III. The plan also contemplated, depending upon market conditions, the construction of a fourth building, Center IV, on vacant land and the possibility of further development of the area for design center and office purposes. The development of the Center was to proceed in phases. The first phase involved the development of Centers I and II.

As originally conceived, Centers I and II were to be dedicated only to tenants in the interior design industry who would use their leased premises as showrooms to display interior design products to the trade. Such products included residential or contract furniture, floor coverings, textiles, wall coverings, accessories, and electrical or construction materials or related merchandise. The original emphasis was on residential furnishings manufacturers but by 1984 the intent of Thom Rock was that Centers I and II of the Center would become a showroom facility for the contract furniture industry. The products included but were not limited to furniture, floor coverings, wall coverings and wall systems, architectural products, lighting products and textile products.

The project proposed a design center, similar in concept to those existing in Chicago, Los Angeles and Phoenix, but larger in scope and with an international cast. The design center, which was a building with showrooms that were to be open to the trade and not to the general public, would host events including periodic industry markets.

Unlike other kinds of commercial buildings, a design center seeks tenants who are in the same business so that when one tenant attracts clients or prospects to its showrooms, such client traffic will also benefit other tenants when those clients and prospects patronize the showrooms of other tenants. The success or failure of a design center is therefore dependent upon the synergy the design center is able to create for its tenants. Thus, unlike other commercial buildings tenants, a design center's tenants are very much dependent upon the success of their co-tenants. For this reason, the nature and character of the tenant base, not just their ability to make their rental payments, is critical to the success or failure of the design center. This synergy was one of the essential underpinnings of the Center and one of the main selling points by which it was marketed, promoted and sold to prospective tenants.

The Center held itself out as the premier design showroom facility of its kind in the United States, if not the world, with world-class architectural and design features and facilities designed exclusively for use by its prospective tenants, all of whom would be in the interior design industry, and intended to become the largest contract furniture design center in the world.

Centers I and II were designed to house approximately 1,000,000 square feet of showroom tenants in the contract furniture industry. Center I is a six story building which has approximately 550,000 square feet of showroom space. Center II is an eight-story building which has approximately 450,000 square feet of showroom space. The great bulk of the floor space was originally divided into many showrooms which front onto common circulation corridors organized around open atrium spaces so that a pedestrian circulation system permitted prospective clients visiting showrooms at the Center to travel easily, not only from showroom to showroom within one of the Centers, but between the buildings as well as across bridges between the buildings located on the 3rd and 4th floors.

By 1984, Centers I and II of the Center were being promoted almost exclusively to the contract furniture industry and an aggressive promotional campaign was undertaken to attract the largest and most important contract furniture manufacturers to the Center. A list of approximately 100 target

companies was established by the IDC which included Herman Miller and several other of the larger contract furniture manufacturers. The list was composed exclusively of contract furniture manufacturers, and marketing efforts directed at the contract furniture industry were originally centered exclusively on these companies. Initially, even companies that were in the contract furniture business, such as dealers, were turned away from the Center as inappropriate tenants in order to limit the roster of tenants at the Center to the most important members of the industry.

However, in the earlier years of marketing itself as a design center, the IDC contemplated that it might not succeed in attracting a critical mass of tenancy that would allow it to lease only to showroom tenant and as a result, the IDC wrote an "escape clause" into leases, such as the lease between IDC and Helikon, giving the landlord the right to rent to non-showroom tenants and the tenant the right to cancel if more than 10% of the space on its floor was occupied by a non-showroom tenant.

On November 11, 1983, IDC leased space to Helikon for a showroom. The Helikon lease contains the following provisions, as excerpted, of which Herman Miller only became aware when it acquired Helikon in 1989:

51. *Pre–Leasing Contingency.*

A. Landlord and Tenant hereby agree that in the event leases for an aggregate amount of not less than two hundred fifty thousand (250,000) square feet of rentable area in the Project have not been duly executed on or before March 31, 1984, either party hereto shall have the right to terminate the Lease, at which time all of the terms and conditions hereof shall become null and void, and both parties shall be relieved of their obligations hereunder without further liability.

B. Landlord and Tenant hereby agree that in the event leases with six (6) of the tenants listed in Exhibit C (who intend to use their premises as their principal showrooms in the New York City area) have not been duly executed on or before March 31, 1984, which leases contain no leasing contingencies which have not been met, Ten-

ant shall have the right to terminate the Lease on or before April 15, 1984. Upon termination of the Lease all of the terms and conditions hereof shall become null and void, and both parties shall be relieved of their obligations hereunder without further liability.

＊　　＊　　＊　　＊　　＊　　＊

55. *Tenancy.*

A. To the extent reasonably feasible, Landlord covenants to lease space in the Project only to tenants who sell *residential or contract furniture, floor coverings, textiles, wall coverings, accessories, electrical or construction materials or related merchandise to the trade*, at wholesale only, and which intend principally to use their demised premises as a showroom for the display of merchandise and for offices related thereto (said tenants hereinafter collectively referred to as the "Design Industry Tenants"), and to those tenants referred to in subsection B below. *Notwithstanding the foregoing, after making reasonable efforts to lease space in the project to the foregoing classes of tenants at rents and subject to terms and conditions acceptable to Landlord, Landlord may, without any liability or limitation, lease space in the Project to tenants of any nature whatsoever as it in its sole discretion shall determine,* provided that it shall lease space on the ground floor in either building in the Project only to tenants meeting the criteria described in this subsection and in subsection B below [emphasis supplied].

＊　　＊　　＊　　＊　　＊　　＊

C. In the event that, at any time during the Term of the Lease, ten (10%) percent or more of the rentable area of the floor on which the Premises is located is leased to tenants, other than Design Industry Tenants, Tenant shall have the right within thirty (30) days of the date of the occupancy of space by such tenants to terminate the Lease, at which time all of the terms and conditions hereof shall become null and void, and Landlord and Tenant shall be relieved of their obligations hereunder without further liability. In the event

Tenant does not terminate the Lease within said thirty (30) day period, Tenant shall be deemed to have waived its right to terminate the Lease.

As the IDC began to succeed in attracting contract furniture industry tenants to the Center, the signing of these tenants became part of the marketing strategy to attract those in the industry who had not yet signed leases for space at the Center. Center marketing materials sent to prospective tenants in the contract furniture industry began listing those contract furniture industry companies that had signed (or purportedly signed) with the IDC and contained references only to tenant companies in the contract furniture industry. Other than support or service companies such as restaurants and a photocopy service establishment, all of the tenants signed up by the IDC prior to the signing of Herman Miller were contract furniture companies which, by the operation of the terms of their leases, were required to use their leased space only for showroom display and sale to the trade, at wholesale only, of contract furniture industry products.

Through the use of these marketing materials as well as through the oral presentations made by IDC employees and agents, the IDC represented that the Center had the intention of becoming the largest contract furniture showroom facility in the world.

The location of the Center in Long Island City was the biggest obstacle to leasing up the Project with contract furniture tenants and the transportation to the Center was frequently frustrating and delayed. On the other hand, the reduced rental rates being offered by IDC as compared to Manhattan market rates was one of the major selling points of the Center.

### The Lease

Herman Miller, which had maintained a showroom facility in Manhattan at 600 Madison Avenue near 56th Street, was initially solicited by the IDC as early as 1983, a solicitation which continued for two years prior to the actual signing of the lease between Herman Miller and IDC.

Throughout this period of solicitation, IDC perceived Herman Miller as one of the most significant potential tenants for the Center. On or about September 8, 1986, Herman Miller and IDC, as agent and on behalf of Thom Rock, entered into an agreement of lease (the "Lease"), bearing that date for Suites 209–218 and portion of Suites 219b and 219c in Center I (the "Premises").

The Lease was for the period from June 1, 1987 through May 31, 1997. The Premises are on the second floor of Center I. For years one through six, Herman Miller has paid an annual base rent of $529,636.50 plus operating expenses. For years six through ten, Herman Miller agreed to pay an annual base rent of $758,668.50 plus operating expenses. The terms of the Lease were the subject of negotiation between the parties, both of whom were ably represented.

One of Herman Miller's primary concerns prior to entering into the Lease was to confirm that the leading contract furniture manufacturers in the industry would be Center tenants.

Section 2(A) of the Lease, entitled "Use and Occupancy," provides as follows:

Tenant shall use and occupy the Premises for the showroom display and sale to the trade, at wholesale only, of the following items and for no other purpose: contract furniture.

The parties understood and intended at the time they entered into the Lease that Section 2(A) of the Lease constituted a restriction on the use to which Herman Miller was permitted to put its Center showroom space.

Section 2(B) of the Lease, entitled "Use and Occupancy," provides as follows:

Landlord covenants that the Project shall be constructed as a first class commercial building intended to be used for showrooms and other related uses.

Section 2(B) was used in virtually all of the leases for all Center tenants (excluding service tenants).

The Lease is a standard form lease prepared by the IDC and used by the IDC for all of its tenants (excluding service tenants) prior to the signing of non-showroom tenants in 1990.

Other standard clauses in the Lease include:

(a) A requirement that tenants covenant to open their showrooms for business during operating hours (Article 2D);

(b) A requirement that no tenant use or occupy their premises in a manner which would adversely affect the appearance, character or reputation of the Building as a first class building with showrooms and other related uses (Article 2D);

(c) A requirement that the Landlord provide a program of advertising and promotional events to assist and promote the business of the tenants in the Project and that the Landlord pay 50% of the costs of such advertising and promotional events up to a maximum of $250,000 (Article 28);

(d) A requirement that the Landlord permit the tenants to establish a Tenants Advisory Committee (the "TAC") to advise the Landlord with respect to promotional events, trade shows and advertising and to perform other functions as well and a requirement that the Landlord meet with the TAC at least quarterly to discuss the promotional program (Article 29); and

(e) Various Rules and Regulations regarding the permissible conduct by Landlord and Tenant (Schedule I).

The Lease also includes a floor plan of the second floor of Center I that shows Herman Miller's space, the general showroom layout of that floor and the pedestrian walkways around the circumference of 60th atrium.

Herman Miller understood that by the terms of the Lease, it was leasing space in a building that would be tenanted exclusively by contract furniture industry tenants using their space as showrooms.

Herman Miller has abided by all the conditions of the Lease.

Section 20 of the Lease, entitled "No Representations By Landlord," provides as follows:

Tenant expressly acknowledges that Landlord and Landlord's agents have not made, and Tenant, in executing this Lease, is not relying upon, any representations, warranties or promises with respect to the Project, the Building, the Real Property or the Premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth herein.

Section 26 of the Lease, entitled, "Inability to Perform," provides, in relevant part, as follows:

This Lease and the obligation of Tenant to pay Rent hereunder and perform all of the other covenants and agreements on the part of Tenant to be performed shall not be affected, impaired or excused because (i) Landlord is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or (ii) Landlord is unable to ... supply or is delayed in ... providing any services ... if Landlord is prevented or delayed from so doing by reason of ... any cause whatsoever beyond Landlord's reasonable control. ...

Section 46 of the Lease, entitled "Miscellaneous, Subsection C," provides, in relevant part, as follows:

This Lease and the attachments hereto shall constitute the entire agreement of the parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect. This cannot be changed, modified or discharged orally but only by an agreement in writing, signed by both parties hereto.

Section 46D of the Lease provides that "(t)his Lease shall be governed by the laws of the State of New York."

***The Subsequent Events***

IDC continued its best efforts to lease all available showroom space in the Center to contract furniture tenants and Herman Miller was satisfied with IDC's efforts to market, promote and advertise the Project to the industry in the period following the execution of the Lease. Designer Saturday, the annual fall event for the benefit of buyers in the industry, was a great success in the first year after Herman Miller's showroom was in operation. In the period 1985–1991, Thom

Rock expended in excess of $6,000,000 in advertising and promoting the Center.

The high growth experienced by the contract furniture and interior design industry through the 1980's continued until the latter part of the decade, at which time the industry started to grow at a decreasing rate, measured in dollar value of shipments made and by 1991 there was a downturn in growth in the contract furniture industry in terms of dollar value of shipments. Due to the unanticipated decreasing growth rate through the latter part of the 1980's, contract furniture manufacturers found themselves with greater capacity than warranted by the then-existing demand.

The decline in the industry resulted from the general decline in the economy, the reduction in need by certain high-profile purchasers and users of new office furniture, such as the insurance and finance industries, and the high level of corporate buy-outs and takeovers, which has also resulted in decreased need for new corporate furnishings.

The decreased demand for contract furniture had a devastating effect on, and contributed to the failure of, a number of interior furnishings manufacturers and led to the consolidation and merger of interior furnishings manufacturers.

The situation was not unique to New York. In the past four or five years, design centers around the country, including the Chicago Merchandise Mart and the Pacific Design Center, have run into difficulty. The Pacific Design Center recently restructured its debt and delayed plans for an additional building, the Chicago Merchandise Mart has consolidated their contract furniture tenants on fewer floors and the Dallas regional center has gone out of the contract furniture business.

Clients of the contract furniture industry have started to demand more of manufacturers and to place less emphasis on showrooms. Buyers are increasingly demanding that manufacturers provide mock-ups of furniture stations and systems for on-site testing, rather than having the buyer to visit showrooms. There is a movement in the contract furniture industry away from showroom facilities and the Designer Saturday fall event was abandoned in 1993 by the industry-wide planning committee. In 1994 a show at the Javits Center will replace the Designer Saturday event.

Therefore, IDC's inability to lease all available space in the Center to contract furniture and related use entities resulted from (1) the collapse of the Manhattan leasing market; (2) the severe downturn in the contract furniture industry with the resulting mergers, consolidations and bankruptcies; (3) the decision of the Urban Development Corporation to alter the intended use of the Merchandise Mart component of the 42nd Street redevelopment potentially directly to compete with the Center which resulted in a suit maintained by Lazard Realty, Inc. in June, 1988 to prevent the Merchandise Mart from becoming a direct competitor of the Center; (4) the reluctance of the design community to travel to Long Island City; (5) the failure of New York City to complete construction of roadways around the Project; and (6) the change in the manner in which end-users conducted business with contract furniture manufacturers.

Between the end of 1986 and February 1989, the Center remained leased at approximately 70% of capacity. In the period September 1988 to the present, approximately 80 tenants have left the IDC prior to the expiration of the tenants' lease expiration dates.

The Center has incurred substantial cash losses in every year of its operations, ranging from $4,147,478 in 1985 to $31,529,463 for the year ending December 1991.

Prior to December 31, 1989, Thom Rock had experienced substantial recurring losses from operations and, as of December 31, 1989, its liabilities exceeded its assets and there existed substantial doubt regarding IDC's ability to continue as a going concern. In June, 1990, Thom Rock defaulted on its loan of $105,000,000 from the Bank of New York. In the period 1985 through 1991, the Center's investors infused in excess of $50,-000,000 of equity to the Project.

On or about January 12, 1990, Thom Rock leased approximately 11,000 square feet of space in Center I located on the second floor of Center I directly adjacent to the Herman

Miller showroom to Stars Production Services, Inc. ("Stars"). Stars is in the business of video tape duplication, video tape storage and television transmissions and thus is an office tenant and does not in any way use its space for showrooms and is not an entity in the contract furniture industry or, even more generally, in the interior design industry.

On February 1, 1990, the IDC, as agent for Thom Rock Realty, signed a lease with the New York City School Construction Authority ("NYCSCA") for approximately 157,000 square feet of space in Center I. Herman Miller first learned of the existence of the NYCSCA lease in or about February 1990. The term of the lease is for ten years. NYCSCA occupies 157,000 square feet of space in Center I of the Center and is an office tenant and does not in any way use any of its space for showrooms.

The NYCSCA is located on the first, second and fourth floors of Center I. To accommodate NYCSCA, the IDC allowed the NYCSCA to build out its space to the edge of what was previously a balcony that provided a walkway around the north end atrium and access to this balcony area is now entirely eliminated and is contained within the walls of NYCSCA office space. In addition, the access bridge between Centers I and II on the fourth floor was eliminated. This tended to isolate each of the buildings and divide what originally was a single unified concept and center.

The IDC also made other changes to the physical appearance of Center I to accommodate the NYCSCA, designating the entrance way on Thomson Avenue as the entrance for NYCSCA only. A sign indicating this was erected over this entrance way. The stairway was reconfigured for use only by NYCSCA. The Center sought to isolate the NYCSCA by creating what it calls a "building within a building."

By 1991, the IDC had undertaken to consolidate all showroom tenants in Center II after the NYCSCA moved in and to transform Center I into office space catering to the business tenants at large in New York City, particularly to the back office function of the financial and service segments of the commercial market. The Center also sought

to lease approximately 300,000 square feet to UNICEF in Center I.

In late 1991, the IDC proposed that Herman Miller move its showroom into smaller space at Center II on terms which provided that Herman Miller would extend its lease, pay its own moving costs, pay its own build-out costs, undertake not to open any other showroom in New York City, and relinquish any rights to sue the IDC.

Herman Miller's current base rent is approximately $26 per square foot and including operating costs is approximately $30 per square foot. Herman Miller expended $2,540,221 on permanent non-moveable improvements to the showroom facility at the Center prior to the Center's signing the lease for space in Center I with the NYCSCA and as of February 1, 1990, the value of the remaining undepreciated improvements at Herman Miller's Center showroom was $1,971,075. The total rent, operating expenses charged by the landlord, rent tax and operating expenses incurred by Herman Miller since January of 1990 described above is $3,837,645.

## CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the controversy under 28 U.S.C. § 1332(a).

### Section 2B of the Lease is a Restrictive Covenant

■ New York's General Obligations Law § 5–1401 states that for contracts of a value greater than $250,000 and entered into after 1984, a choice of law provision in the contract which designates New York law as controlling disputes arising out of the contract must be enforced, *Bank of Am. Nat. Trust & Sav. Ass'n. v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 265 (S.D.N.Y.), *aff'd*, 923 F.2d 843 (2d Cir.1990), and as found above, Section 46D of the Lease contains such a provision.

■ Moreover, aside from the terms of the contract, New York's choice of law rules dictate that New York law apply here as well. As stated in *Hutner v. Greene*, 734 F.2d 896, 899 (2d Cir.1984) (quoting *Intercontinental Planning, Ltd. v. Daystrom,*

*Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969)):

> New York courts apply a "paramount interest" test to choice of law issues involving contractual disputes. Under such a test, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contracts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."

Since the Premises are located in New York, the Lease was entered into in New York and Thom Rock is a partnership with its principal place of business in New York, New York has the greatest interest in this litigation.

### Ambiguity in the Herman Miller Lease can be Resolved by Extrinsic Evidence

■ *Storwal Int'l, Inc. v. Thom Rock Realty Co.*, 768 F.Supp. 429 (S.D.N.Y.1991), presented the identical issue presented here, and its decision collaterally estops Thom Rock from asserting that the Miller lease is unambiguous here, having been the defendant in *Storwal. See Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985).

Storwal International Inc. ("Storwal") is a furniture company which, like Herman Miller, leased space at the Center. Storwal also brought suit against Thom Rock for damages due to the IDC's breach of its lease when it began renting to non-contract furniture tenants. Thom Rock moved for summary judgment on the grounds that the lease did not contain the representations alleged by the plaintiff and, furthermore, that the plaintiff was prohibited from introducing any additional evidence outside the four corners of the lease to vary or modify the lease terms. In support of its position, the defendant referred to the integration clause contained in Storwal's lease.

In *Storwal* it was held that Storwal's lease, which is substantially similar to the lease of Herman Miller, was ambiguous as a matter of law and lent itself to two possible interpretations. This Court went on to state that where language is ambiguous, parol evidence will be admissible not to vary the terms of

the lease but, rather, to assist the Court in construing the ambiguous language. *Id.* at 431 (citing *Proteus Books, Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 509 (2d Cir. 1989)); *see also Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320, n. 2 (2d Cir.1975); *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245 248–49, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975); *Mister Filters, Inc. v. Weber Envt'l Sys.*, 44 A.D.2d 639, 640, 353 N.Y.S.2d 835 (3d Dept.1974). This Court also held that this rule applies even where the lease contains an integration clause. *Storwal*, 768 F.Supp. at 431 (citing *Proteus Books* at 509); *see also Baldt Corp. v. Tabet Mfg. Co.*, 412 F.Supp. 249, 254 (S.D.N.Y.1974), *aff'd*, 517 F.2d 1395 (2d Cir. 1975); *Concoff v. Occidental Life Ins. Co.*, 4 N.Y.2d 630, 176 N.Y.S.2d 660, 663, 152 N.E.2d 85, 88 (1958).

■ When a contract is ambiguous, as is the case here, it must be strictly construed against the party who drafted the agreement and on whose form such agreement exists. *Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir.1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentum* principle requires that the ambiguity be construed against that party."); *Mitsubishi Corp. v. Guinomar Conakry*, 1993 WL 254994, at *4 n. 3 1993 U.S.Dist. LEXIS 8853, at *8 n. 3 (S.D.N.Y. June 30, 1993) (collecting cases). More particularly, when a use clause contained in a lease is ambiguous, the interpretation of the clause should be construed against the party who drafted the provision. *Sky Four Realty Co. v. C.F.M. Enters., Inc.*, 128 A.D.2d 1011, 513 N.Y.S.2d 546, 547 (3d Dept.1987) (citing *67 Wall Street Co.*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975)).

■ The Storwal and Herman Miller leases are substantially similar as both are standard form leases drafted substantially by and approved by the landlord. As in the Storwal lease, the portion of the Herman Miller lease which focuses on the use of the Center is contained in Sections 2A and 2B of the Lease. Paragraphs 2B of both the Storwal and Herman Miller Lease state, "Landlord

covenants that the Project shall be constructed as a first class commercial building intended to be used for showrooms and other related uses." Paragraphs 2A of both leases contain a reciprocal clause restricting the tenant's use of its premises. In Herman Miller's Lease, paragraph 2A states that, "Tenant shall use and occupy the Premises for the showroom display and sale to the trade, at wholesale only, of the following items and for no other use or purpose: contract furniture."

In *Storwal,* this Court held that restrictive covenants such as Sections 2A and 2B of the Lease must be interpreted in conjunction with the entire lease. *Storwal,* 768 F.Supp. at 432 (citing *Eagle Spring Water Co. v. Webb and Knapp, Inc.,* 236 N.Y.S.2d 266, 280 (Sup.Ct.1962)). The Court went on to cite several lease provisions, also present in the Herman Miller Lease, which restrict the IDC to contract furniture uses or, at the very least, render the use clause ambiguous and capable of such an interpretation.

For example, Paragraph 15 of the Rules and Regulations appended to both the Storwal and Herman Miller lease as Schedule 1 provides that:

> Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's opinion, tends to impair the reputation of the Building or the Project or its desirability as a building for showrooms. . . .

Additionally, paragraph 28A of both leases provides that the landlord will undertake "a program of advertising and promotional events in order to assist and promote the *business* of the tenants in the project." (Emphasis added). This Court emphasized the fact that this paragraph refers to the tenant's "business" rather than "businesses". In conjunction with paragraph 28, paragraph 29, present in both leases, permits tenants in the project to establish a Tenants Advisory Committee to advise the landlord with respect to promotional events, trade shows and advertising for the industry of the tenants.

Thus, upon a review of the Lease read in its entirety, Article 2(B), in conjunction with the other Lease provisions, suggests a restrictive use clause binding on the Landlord. As this Court has stated,

> [O]ther provisions in the contract (relating to advertising and special events as well as restrictions on the tenants' use of the premises) can be read to anticipate the establishment of the Project as a center for the sale and display of office furniture and these clauses support the interpretation that Thom Rock has a concomitant obligation to lease only to tenants in this business. Therefore, as a matter of law, the meaning of Paragraph 2(B) is at the very least ambiguous.

*Storwal,* 768 F.Supp. at 432.

Here, the extrinsic evidence demonstrates that the IDC intended to restrict the use of the Center solely for contract furniture industry showrooms and related uses and, more importantly, covenanted to Herman Miller that the Center would, in fact, house only showrooms for the contract industry.

For example, a letter to William DeKraker of Herman Miller from Arthur Katz, a leasing agent for the IDC, dated October 16, 1985, included a brochure describing the potential Herman Miller space in Center I of the Center. This brochure stated unequivocally that "[t]he first phase of IDCNY [the Center] contains 1,000,000 square feet of showrooms for contract manufacturers."

Based upon the extrinsic evidence already in the record in this case, it is evident that the IDC and its employees covenanted to Herman Miller that the IDC would be used solely for contract furniture showrooms and related uses.

### Breach of the Restrictive Covenant Entitles Herman Miller to Damages

■ The proper measure for damages for a breach by the landlord of a lease covenant restricting the landlord's use of other premises retained by the landlord is the difference between the rental value of the leased premises with and without the breach. *Fairview Hardware, Inc. v. Strausman,* 9 A.D.2d 944, 944, 195 N.Y.S.2d 816 (2d Dept.1959) (proper measure of damages for breach of restrictive covenant in lease is "difference in rental value of appellant's premises with the covenant unbroken and broken"); *Ripley Mfg. Corp. v.*

*Roosevelt Field, Inc.,* 18 A.D.2d 924, 238 N.Y.S.2d 133 (2d Dept.1963) (to same effect); *Kennedy v. Abarno,* 277 A.D. 883, 97 N.Y.S.2d 907 (1950) (to same effect); *Gerber's Fast Food Serv., Ltd. v. S & E Realty Co.,* 83 A.D.2d 602, 441 N.Y.S.2d 310 (2d Dept.1981), *aff'd,* 55 N.Y.2d 939, 449 N.Y.S.2d 192, 434 N.E.2d 261 (1982); 74 N.Y.Jur.2d, *Landlord and Tenant* § 92, p. 131–32 ("The measure of damages for breach of the landlord's restrictive covenant is the difference in value between the tenant's leasehold with the covenant ... unbroken and the same leasehold with the covenant broken"); *Id.* § 113, at 152 ("For a breach of covenant by the lessor, the lessee is entitled to recover the difference in value of the leased premises as they were to be for the purpose contemplated and their value as they are because of the breach, not the rent paid by the lessee").

■ Absent proof of substantial damages, the tenant may be entitled to nominal damages. *United States v. Bedford Assocs.,* 548 F.Supp. 732, 740 (S.D.N.Y.1982), *aff'd in part & modified in part,* 713 F.2d 895 (2d Cir.1983). In the event the tenant fails to establish that breach of the covenant results in either a loss of profits or a reduction in rental value, the tenant is not entitled to recover any damages. *C.L. Holding Corp. v. Schutt Court Homes, Inc.,* 307 N.Y. 648, 649–50, 120 N.E.2d 837 (1954).

■ Herman Miller is not seeking lost profits in this action. Thus, in accordance with the foregoing principles, Herman Miller's damages are limited to the difference in the value of Herman Miller's leasehold interest with and without the presence of NYCSCA and Stars in the Center. Specifically, the evidence adduced at trial makes manifest that IDC used its best efforts, but was unable due to factors beyond its control, to lease the vast majority of the NYCSCA space or any of the Stars space to contract furniture tenants. Accordingly, the relevant comparison is the value of Herman Miller's showroom with the space at issue occupied by the NYCSCA and Stars versus the value of Herman Miller's showroom with the space at issue remaining vacant.

■ To the extent Herman Miller is seeking to recover the cost of its leasehold improvements, it seeks damages that simply are not recoverable as a matter of law in an action premised upon an alleged breach of lease. Herman Miller is essentially seeking damages that would be awardable, upon a proper showing, to the prevailing party on a claim for rescission, based upon a claim for fraud. *See National Conversion Corp. v. Cedar Bldg. Corp.,* 23 N.Y.2d 621, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969).

■ Even where liability is established, a plaintiff seeking to recover for breach of a restrictive lease covenant must still prove that it was damaged as a proximate result of the defendant's breach and that the alleged loss is capable of proof with reasonable certainty and not speculative. *See Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986); *Forsee Corp. v. Pergament Enters.,* 198 A.D.2d 397, 604 N.Y.S.2d 123 (2d Dept.1993).

### *Under the Circumstances Here Herman Miller Is Entitled to a Reduction of the Term of the Lease*

■ Herman Miller established without question that IDC rented space to a tenant that was not part of the contract furniture industry and thereby breached the terms of the restrictive covenant. Although Herman Miller presented evidence that foot traffic in its showroom declined, that decline began before the leasing of space to the NYCSCA and Stars in early 1990 and the record establishes that the contract furniture industry was a victim of the recession and its attendant restructuring of the industry. No direct evidence was presented that sought to differentiate between these negative factors found above.

However, the evidence does establish that the concept of synergy had value, that the restrictive covenant was part of the bargain between the parties and that IDC was forced by the economics of the situation to violate the provisions of the Lease. Under these circumstances Herman Miller seeks an all or nothing remedy, a remedy which is precluded by the authorities cited above. While the quantification of the diminution of the value

of the Lease may be difficult, it is undeniable that such diminution has occurred.

Defendants submitted evidence at trial that space at the Center should be offered for the "effective" taking rental of $8.13 per square foot in October of 1991.[1] (Def.'s Ex. HC at 24–25.) The Plaintiff claims, and the Defendant does not dispute, that the net effective rent under the Miller Lease, calculated in the same manner, is $20.43, which represents a decline of 60%. (Def.'s Rep. Mem. on Remedies at 2–3 & n. 1.)

In a February 15, 1990 internal memorandum, Mr. Martin P. Dugan ("Dugan"), Vice President of Facilities Management for Herman Miller, opined that, if Herman Miller hired a broker to sublease its space at the IDCNY, it would well end up with only 50 cents of every dollar yet to be spent for the remaining term of each lease." Dugan testified that he is responsible for anything pertaining to Herman Miller facilities, including building construction, real estate, and maintenance.

At trial, Dugan testified that this assessment was made before he knew the implications of the lease to the NYSCA, or what the impact such lease would have on the project. This assessment, by a highly knowledgeable employee of Herman Miller, provides a basis from which to infer that the value of Herman Miller's lease had declined by approximately 50% for reasons unrelated to the Defendant's breach of the Lease.

The effective rental value of Herman Miller's space at the IDCNY has declined by 60%, 50% of which was caused by factors unrelated to the breach of the lease by the Defendants. Applying this quantification to the term of the Lease which has been violated produces a just result. At the time of the breach by the Defendant, Herman Miller had approximately 7.5 years remaining on its 10 year lease. Using the 10% factor for calculation, the 7.5 years remaining on the lease should be shortened by .75 years. By this calculation, the lease will terminate as of August 31, 1996.

*Conclusion*

Section 2B of the Lease is a restrictive covenant which Thom Rock violated by leasing space to tenants that were not in the contract furniture industry. The proper measure of the damage suffered by Herman Miller is 10% of the value of the Lease from the date of the breach, and under the circumstances of this case, it is appropriate to direct the termination of the Lease on August 31, 1996.

Submit judgment on notice in accordance with this opinion with costs to Herman Miller.

It is so ordered.

---

1. The "effective" rental rate is a function of the face rental, any periods of free rent given to the tenant, and any work allowances afforded to the tenant. (Def.'s Rep.Mem. on Remedies at 10; Def.'s Ex. HC at 24–25.)