**HERMAN MILLER, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**THOM ROCK REALTY COMPANY, L.P., Defendant–Appellant–Cross–Appellee.**

Nos. 778, 890, Dockets 94–7586, 94–7618.

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1994.

Decided Jan. 24, 1995.

Dean G. Yuzek, New York City (David G. Ebert, Hutton Ingram Yuzek Gainen Carroll & Bertolotti, New York City, of counsel), for defendant-appellant Thom Rock Realty Co., L.P.

Eric M. Kraus, New York City (Allen M. Hecht, Randi F. Seffinger, Sedgwick, Detert, Moran & Arnold, New York City, of counsel), for plaintiff-appellee Herman Miller, Inc.

Before FEINBERG, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This is a suit over the meaning of a lease provision. Neither the landlord, Thom Rock Realty Company, L.P., nor the tenant, Herman Miller, Inc., disputes that the expectations of the parties at the time the lease was entered into have been frustrated. What was to have been a world class showroom building exclusively devoted to the contract furniture trade has now become an ordinary commercial structure. Concomitantly with the dashing of the parties' bright prospects came the instant litigation in which the tenant seeks damages and asks to be relieved from its lease. The landlord insists that the thwarting of the parties' joint expectations was brought about by a general downturn in economic conditions—particularly severe in the contract furniture industry—and that its actions to mitigate the effects of such an economic downturn were in no way limited by its lease with the tenant.

Everyone knows how true is the poet's observation: "The best-laid schemes o' mice and men, Gang aft a-gley, And lea'e us nought but grief and pain, For promised joy." Robert Burns, "To A Mouse," *The Poetical Works of Robert Burns* (Little, Brown & Co. 1863). It devolves on us to decide whether, under the terms of this lease, it is the landlord or the tenant who must suffer pain, in the form of damages, after their leasing scheme goes awry.

## BACKGROUND

In 1983 defendant, Thom Rock Realty Company (Thom Rock), a New York limited partnership, began to develop property it owned in Long Island City, Queens, New York, with the goal of making the property a world-renowned first-class interior design showroom center. It named the development the International Design Center of New York (Center). The construction plan, created by I.M. Pei & Partners, envisioned at least four buildings devoted to this purpose. The first phase of the Center's development comprised two buildings known as Center I and Center II that together totaled almost one million square feet of commercial space to be devoted exclusively to showroom tenants. By 1984 the plan had been refined so that Centers I and II would become showroom facilities for the contract furniture industry. Contract furniture manufacturers make and sell furniture products for commercial users such as offices and hotels.

The concept of a design center is to house tenants in the same or complementary businesses so that client traffic generated by one tenant provides potential customers to the other tenants. Because the success of such a center is dependent upon the synergy it creates for its tenants, the nature and character of the tenant base is critical. Therefore, the marketing strategy for the Center targeted as potential tenants only the largest and most important contract furniture manufacturers.

In its early years, a principal concern of the Center was whether or not it would

successfully attract a critical mass of tenants to enable it to lease only to showroom tenants. As a result, the early leases included an "escape clause," giving the Center the right to lease to non-showroom tenants, and the tenant the right to terminate the lease if more than ten percent of the space on its floor was occupied by non-showroom tenants. Other than support or service companies— like restaurants and a photocopy center—all of the tenants in the Center at the time plaintiff entered into its lease and became a tenant of defendant Thom Rock were contract furniture companies which, by the terms of their leases, were required to use their space for showrooms and sales to the trade.

The plaintiff is Herman Miller, a Michigan corporation and a leading company in the contract furniture industry. At the time of the Center's development, Herman Miller had a New York presence located on Madison Avenue near 56th Street in mid-town Manhattan. On September 8, 1986, after a two-year solicitation, the Center succeeded in signing Herman Miller to a ten-year lease for premises located on the second floor of Center I. The lease did not include the escape clause included in earlier leases. As was the case for all tenants other than restaurants and the photocopy center, the lease provided that Herman Miller could use the premises only for showroom display and sale of contract furniture to the trade. Contained in the lease was the following standard provision: "Landlord covenants that the Project shall be constructed as a first class commercial building intended to be used for showrooms and other related uses." This clause is the subject of the instant litigation.

The growth of the contract furniture industry in the early and mid–1980s seemed to ensure the success of the Center. Neither party anticipated the general economic downturn of the late 1980s and early 1990s and the effects of that downturn on the contract furniture industry. Demand decreased significantly, resulting in the failure of numerous manufacturers and consolidation and mergers of the surviving companies. In addition, buyers of contract furniture began demanding services such as mock-ups and on-site testing of furniture, rather than visiting showrooms. As a result of these economic and industry trends—combined with the reluctance of the design community to travel to Long Island City and the failure of New York City to complete construction on improved access roads surrounding and leading to the Center—large numbers of tenants left the Center prior to the expiration of their leases. The Center incurred substantial cash losses, losing over $31 million in 1991 alone. Notwithstanding cash infusions from investors of over $50 million, its losses mounted so that its liabilities exceeded its assets, and it was forced to default on outstanding bank loans.

To mitigate these devastating losses, Thom Rock abandoned, or at least modified, its plan to rent only to showrooms. In January 1990 it leased space on the second floor of Center I, directly adjacent to Herman Miller, to Stars Production Services, Inc. (Stars), a video tape duplication and storage company. The following month approximately 157,000 square feet of space also in Center I was rented to the New York City School Construction Authority (NYCSCA). This space occupies three of the building's six floors, including the second floor where Herman Miller is located, and comprises about 28 percent of Center I. Neither of these tenants is in the contract furniture industry, nor do they use their space as showrooms. In order to accommodate NYCSCA, Thom Rock made numerous changes to the physical appearance of the building that effectively isolated tenants in Center I from Center II, and generally reduced the ability of clients to travel easily from showroom to showroom.

In late 1991 the Center proposed consolidating all the contract furniture showrooms into one building. It asked Herman Miller to move its showroom into a smaller space in Center II, extend its lease, covenant not to open any other showrooms in New York City and relinquish any claims it might have against the landlord. Plaintiff refused to accept these suggestions and in March 1992 brought the instant action against Thom Rock in the United States District Court for the Southern District of New York (Sweet,

J.), seeking, as noted, to be relieved of its lease obligations and to recover damages.

After a bench trial, Judge Sweet ruled, in a written opinion dated April 22, 1994, that the lease between the parties contained a covenant restricting the landlord to lease premises only to contract furniture showrooms, and that this covenant was breached by Thom Rock when it leased premises to Stars and NYCSCA. 849 F.Supp. 911. The district court declined to grant the recision requested by plaintiff. Determining that the proper measure of damages was the difference in value of the leasehold with and without the breach, the district court concluded that the value of Herman Miller's space had declined by a total of 60 percent, that 50 percent of the decline was caused by factors other than Thom Rock's breach, and therefore that 10 percent of the decline in value was attributable to the breach of the restrictive use covenant. Since damages were calculated to be a ten percent loss in value of the lease and since Herman Miller had, at the time of the breach, 7.5 years remaining under the lease, the trial court reduced the lease's remaining term by .75 years. That is, the lease was shortened from its ten-year term ending May 31, 1997 by a period of nine months to terminate on August 31, 1996. An order was entered accordingly on May 20, 1994.

Thom Rock appeals from this judgment, challenging the finding that the lease contained a restrictive use covenant. Herman Miller cross-appeals the damages remedy of reducing the lease term by nine months. We affirm with respect to the existence of a restrictive use covenant and reverse and remand with respect to damages.

## DISCUSSION

Herman Miller insists the lease contains a restrictive use covenant. Thom Rock, in urging the contrary, argues primarily that the district court correctly ruled that the subject provision, standing alone, was not a restrictive use covenant. But, the landlord maintains, the trial court erred when it looked first to the entire lease and later to extrinsic evidence to ascertain the provision's meaning. This, Thom Rock asserts, was error because to constitute a restrictive use covenant, the language of the lease must expressly and explicitly state such an intent. Such a use may not be inferred. Thus, defendant concludes, if the provision is sufficiently ambiguous to call for extrinsic evidence to divine its meaning, it cannot at the same time be so clear and explicit as to constitute a use restriction.

## I  Restrictive Use Covenant

We turn to a discussion of the merits. The first issue presented is whether the language contained in the lease constituted a restrictive use covenant that was subsequently breached; the second issue is the appropriate measure of damages for the breach of the covenant. A third issue raised by Herman Miller challenges the striking of its demand for a jury trial.

The lease itself provides that its construction is governed by the laws of New York. Under long established law, New York construes restrictive use covenants so as to carry out the intent of the parties, *see Bovin v. Galitzka*, 250 N.Y. 228, 232, 165 N.E. 273 (1929), provided that such intent is found unmistakably expressed in the lease, *see Schoonmaker v. Heckscher*, 171 A.D. 148, 151, 157 N.Y.S. 75 (1st Dep't), *aff'd*, 218 N.Y. 722, 113 N.E. 1066 (1916). Such intent may be discerned from an examination of the whole lease and need not, as Thom Rock urges, be drawn solely from the particular provision under scrutiny. *See Bovin*, 250 N.Y. at 232, 165 N.E. 273. Unless the language of the lease makes it clear that a restriction is intended, the language is viewed simply as descriptive of the use a party may make of the premises, and not as a limitation on that use. *See generally* 1 Joseph Rasch, *New York Landlord and Tenant*, § 15.39 at 703, § 15.59 at 729 (3d ed. 1988). If, after examination of the whole lease, a court is persuaded that a restrictive use was intended by the parties, it should give effect to that intention. *Peoples Sav. Bank v. County Dollar Corp.*, 43 A.D.2d 327, 330–31, 351 N.Y.S.2d 157 (2d Dep't), *aff'd*, 35 N.Y.2d 836, 362 N.Y.S.2d 864, 321 N.E.2d 784 (1974).

■ Analyzing the lease in light of New York law, the already cited restriction on use found in paragraph 2B bears repeating: "Landlord covenants that the [Center] shall be constructed as a first class commercial building intended to be used for showrooms and other related uses." While this provision, standing alone, does not expressly and explicitly convey the intent to restrict the landlord's use of the property, an examination of other lease provisions in conjunction with paragraph 2B makes such intention clear. Paragraph 2A restricts tenant's use of the leased premises to "showroom display and sale to the trade, at wholesale only, of [contract furniture] and for no other use or purpose." This boilerplate restriction, contained in the lease of every Center tenant other than the restaurants and copy center, carries out the overall concept of the landlord's building as an exclusive showroom center for the contract furniture industry.

■ Under New York law restrictions on a tenant's use, without more, will not be extended by implication to create a reciprocal restriction on the landlord. *See Rockland Dev. Assoc. v. Richlou Auto Body, Inc.*, 173 A.D.2d 690, 691, 570 N.Y.S.2d 343 (2d Dep't 1991). In the instant lease, the intention to restrict the Center to a design showroom facility is evinced by other provisions of the lease. Paragraph 2D prohibits any Center tenant from using the premises in any manner which, in Thom Rock's reasonable judgment, would adversely affect "the appearance, character or reputation of the [Center] as a first class building with showrooms and other related uses." This concern over the Center's showroom character is further shown by Rule 15, appended to the lease as part of Schedule 1, which prohibits any tenant advertising that "tends to impair the reputation of the [Center] or its desirability as a building for showrooms." Also, in order to bolster the synergy that the Center sought by creating client traffic beneficial to all Center tenants, paragraph 2D includes a covenant by each tenant to "open its showroom for business and continuously be open for business at all times" during the Center's operating hours. Because disregard for such an obligation would be injurious to all other tenants seeking to capitalize on complemen-tary client traffic, Article 32 provides that if a tenant fails to open for business such tenant shall pay liquidated damages in the amount of 150 percent of its rent for every day it remains closed.

Further, examination of Articles 28 and 29, entitled "Promotions and Trade Shows" and "Tenants Advisory Committee," respectively, is particularly instructive as to how the Center was viewed by the landlord as a property restricted to the use of showrooms. Paragraph 28A obligates the landlord to undertake "a program of advertising and promotional events in order to assist and promote the business of the tenants in the [Center]." Use of the singular "the business" to refer to all the tenants clearly envisions a homogenous tenant base. In undertaking its obligations to promote the Center and its wares, Article 29 established a tenants advisory committee to advise landlord regarding such advertising, promotional events and trade shows and obligates landlord to meet with this committee.

We are persuaded after reviewing all these lease provisions, as was the district court, that the intention of the parties was that the Center would be devoted exclusively to contract furniture showrooms. Because this intention is clearly found within the four corners of the lease, the covenant set forth in paragraph 2B cannot be read as merely descriptive. Consequently, we hold that paragraph 2B is a restrictive use covenant restricting Thom Rock from leasing Center space to any tenants outside the contract furniture showroom business. In light of our conclusion that the lease itself provides evidence that a restriction on Thom Rock was intended, we need not review the alternative bases on which the district court founded its holding.

## II Damages

We pass to the damages issue. There is no dispute that neither Stars nor NYCSCA is in the contract furniture business. Hence, it is evident that leasing space to them in the Center was a breach of the restrictive use covenant by Thom Rock. Remaining for

analysis is the proper measure of damages.[1] As a preliminary matter, Herman Miller argues that due to a complete frustration of purpose in entering the lease, it is entitled to complete recision. Alternatively, it attacks various aspects of the trial court's calculation of damages as erroneous.

■ Notwithstanding plaintiff's contention, New York courts leave *no room for doubt* that damages are the appropriate remedy for breach of a restrictive use covenant and that such damages are measured by the difference in value between the tenant's leasehold with the covenant unbroken and with the covenant broken. *See Gerber's Fast Food Serv., Ltd. v. S & E Realty Co.,* 83 A.D.2d 602, 603, 441 N.Y.S.2d 310 (2d Dep't 1981), *aff'd,* 55 N.Y.2d 939, 449 N.Y.S.2d 192, 434 N.E.2d 261 (1982); *Ripley Mfg. Corp. v. Roosevelt Field, Inc.,* 18 A.D.2d 924, 924–25, 238 N.Y.S.2d 133 (2d Dep't 1963); *Fairview Hardware, Inc. v. Strausman,* 9 A.D.2d 944, 944, 195 N.Y.S.2d 816 (2d Dep't 1959). Judge Sweet credited evidence that the value of the leasehold had declined 60 percent and that a 50 percent decline had resulted from outside economic and industry factors independent of the breach of the restrictive use covenant, resulting in his belief that a 10 percent decline in value was caused by Thom Rock's actions.

Herman Miller challenges the trial court's findings on three grounds: (1) the 60 percent decline in value erroneously measured the value of the leasehold after the breach as office space and not as a showroom; (2) outside economic and industry factors should not have been incorporated into the damages calculation; (3) if outside economic factors are so incorporated, the district court improperly ignored credible evidence that they amounted to a diminution of only 25 to 30 percent of the value of the lease and improperly credited evidence that a 50 percent decline resulted from outside factors.

■ Turning to Herman Miller's first contention, in determining the reduction in value of Herman Miller's leasehold, the district court began with a value for the premises of $20.43 per square foot before the breach and $8.13 per square foot after the breach, a decline of 60 percent. The $8.13 amount came from a "Proposal for Leasing" done for the Center by a commercial real estate company. An examination of this proposal shows that it and its valuations are based on repositioning the Center as an office building. In determining damages as a result of the landlord's breach of a covenant under these circumstances, the proper value of the premises after the breach is the value for *the same purpose* the premises served prior to the breach. *See City of New York v. Pike Realty Corp.,* 247 N.Y. 245, 249, 160 N.E. 359 (1928); *cf. Rumsey v. New York & N.E. R.R.,* 133 N.Y. 79, 83–84, 30 N.E. 654 (1892) (tenant's damages determined by diminished value of the property as it was, not potential value if property had been put to another use). As a result of Thom Rock's breach, Herman Miller's leasehold was not converted into office space. Rather, the leasehold's value, if any, is that of a contract furniture showroom in an ordinary office building. While the testimony of Miller's expert that the value of such premises is zero appears inexact, reliance on a valuation of Herman Miller's leasehold as office space was clearly erroneous and requires reversal.

■■ We turn to plaintiff's second and third challenges: whether diminution in value of a leasehold interest—unrelated to defendant's breach—should be deducted from damages due plaintiff, and if so what such diminution was in the present case. A landlord who breaches a lease can only be held liable for the damages occurring as the proximate result of its breach. *See Foresee Corp. v. Pergament Enterprises,* 198 A.D.2d 397, 399, 604 N.Y.S.2d 123 (2d Dep't 1993); *see also Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). The trial court's opinion notes that client traffic began to decrease prior to the introduction of the non-showroom tenants since the contract furniture industry was a victim of the recession. The landlord cannot be held accountable for the

---

1. Whether Miller is entitled to monetary damages instead of a reduction in the term of the lease was not raised or briefed on appeal. In any event, we believe the form the damages take should be left in the first instance to the district court.

loss of value resulting from events not of its own making. Hence, outside factors were properly incorporated into the damages calculation.

With respect to the percentage of the diminished value such factors accounted for, the trial court stated there was no direct evidence before it that sought to differentiate between these "negative factors," that is, the diminution in value caused by the presence of the Stars and NYCSCA and the diminution in value caused by general economic conditions. It determined that factors unrelated to defendant's breach accounted for 50 percent of the decline of Herman Miller's leasehold. The 50 percent figure was derived from witness Dugan's estimate that if Herman Miller tried to sublease its space at the Center, it might not get more than 50 cents for every dollar yet to be spent for the remaining term of its showroom lease.

We are troubled by the district court's failure to address what may be the more accurate measurement of damages found in witness Jinishian's testimony. Jinishian, a commercial real estate broker with expertise in the field of commercial leasing, testified that economic and industry factors caused the value of Herman Miller's showroom space to decline by about 25 to 30 percent. Because this testimony was apparently ignored by the trial court, it is necessary to remand this aspect of the damages question to the district court. *See Greer v. United States,* 505 F.2d 90, 93 (5th Cir.1974) (remanding case to district court for recomputation of damages in light of district court's failure to consider evidence).

As a consequence, we hold that because the measurement of the value of plaintiff's leasehold after defendant's breach was erroneously based on its value as office space and because certain testimony favorable to the tenant was ignored, the district court's remedy of a nine-month reduction in the term of the lease must be reversed and the matter remanded for a new determination of damages.

### III   Jury Demand

Finally, Herman Miller asserts the district court erred when it enforced the jury waiver provision of the lease and struck its jury demand. Plaintiff's contention is based on New York Real Property Law § 259-c, which renders jury waiver provisions unenforceable in certain circumstances. As the district court noted, the proper scope of § 259-c under New York law is unsettled. *See Herman Miller, Inc. v. Thom Rock Realty Co.,* 819 F.Supp. 307, 308 (S.D.N.Y.1993). Plaintiff has failed to persuade us that the district court wrongly denied it a jury trial on the basis of the lease provision.

### CONCLUSION

Accordingly, the judgment of the district court appealed from by Thom Rock insofar as it ruled the lease contained a restrictive use covenant that was breached is affirmed. The damage award from the same judgment challenged in the cross-appeal brought by Herman Miller is reversed and the case is remanded to the district court for further proceedings in accordance with this opinion.

Affirmed, in part, reversed and remanded, in part.