OPINION OF THE COURT
Edward H. Lehner, J.
The prime issue raised on this motion by plaintiff for injunctive relief is whether the terms of the subject lease, principally *754 the clause that states that the building “will be run as a first class office building,” bar the defendant from converting the second to tenth floors to residential occupancy.
Plaintiff, a prominent law firm, has been a tenant of the building at 67 Wall Street since 1942, presently occupying the eleventh to fifteenth floors. Defendant acquired the building in March 2004 and previously had made known its intention to convert the lower floors to residential use. In an estoppel certificate it issued to defendant in February 2004, plaintiff stated that a conversion for use other than as a first-class office building “would constitute a default under the lease.” In the spring of 2004, a construction loan was obtained by defendant and in October 2004 it filed an application with the Buildings Department for permission to perform the conversion, which permit was approved on December 21, 2004.
The crucial provision of the present lease is section 9E thereof, which is part of a section dealing with “expense escalation,” and which provides that “the Building will be run as a first-class office building in the Borough of Manhattan and in a reasonable and prudent manner.” The explanation as to the origin of this clause, which first became a part of plaintiffs lease in 1973, is set forth in the affidavits of W. Cullen MacDonald sworn to December 22, 2004 and John P Fenner sworn to January 31, 2005, wherein they state that in 1973 plaintiff was concerned that space in the building was occupied by the New York City Taxi and Limousine Commission. MacDonald avers that plaintiffs clients and employees “had to ride elevators and share the lobby with disgruntled taxi drivers who had just been subjected to disciplinary action by the Commission and were acting out through unsavory and violent conduct” (11 15). However, this background information is not helpful in interpreting the aforesaid clause as the appropriate issue (as noted in paragraph 38 of the MacDonald affidavit) in determining what is a “first class” office building deals primarily with the maintenance and service provided, not the quality of the tenancy. Hence, the court, near the conclusion of the extensive oral argument, suggested that, since the papers did not appear to raise a triable issue of fact with respect to the intent of section 9E, the parties agree to convert the motion to one for summary judgment. Alternatively, the court proposed an immediate trial. However, both proposals were rejected by plaintiff as it indicated that it intended to amend its complaint to assert other lease violations.
*755 ' The motion before the court is to enjoin defendant from taking any action (a) which would violate the plaintiffs lease, and (b) to convert the building to residential use. Seeking to enjoin an unspecified activity is not justiciable and hence the first above-referred-to request to direct defendant not to violate the lease is denied without prejudice to any future application to enjoin any threatened or actual specified activity. With respect to the latter request, to be entitled to the relief £‘plaintiff! ] had to show a probability of success, danger of irreparable injury in the absence of an injunction, and a balance of the equities in [its] favor” (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]).
It has been said that a preliminary injunction is a drastic remedy that “require [s] a clear showing of likelihood of ultimate success on the merits” (Faberge Intl. v Di Pino, 109 AD2d 235, 240 [1st Dept 1985]; see also, Credit Index v RiskWise Intl., 282 AD2d 246 [1st Dept 2001]; Scotto v Mei, 219 AD2d 181 [1st Dept 1996]; SportsChannel Am. Assoc. v National Hockey League, 186 AD2d 417 [1st Dept 1992]). However, “the existence of a factual dispute will not bar the granting of a preliminary injunction if one is necessary to preserve the status quo and the party to be enjoined will suffer no great hardship as a result of its issuance” (Mr. Natural v Unadulterated Food Prods., 152 AD2d 729, 730 [2d Dept 1989]; see also, Sau Thi Ma v Lien, 198 AD2d 186 [1st Dept 1993]).
Both parties agree that the law relating to restrictive covenants governs the interpretation of the purported restriction set forth in section 9E. In Ewing v Watson (15 AD3d 340, 343 [2d Dept 2005]), the Court summarized the rules applicable to restrictive covenants as follows:
“ £[T]he law has long favored free and unencumbered use of real property, and covenants restricting use are strictly construed against those seeking to enforce them’ (Witter v Taggart, [78 NY2d at 237]; see Huggins v Castle Estates, 36 NY2d 427, 430 [1975]). £[A]ny ambiguity in a covenant restricting use must be strictly construed against those seeking to enforce it, and the court must interpret the covenant to limit, rather than extend, its restriction’ (9394 LLC v Farris, 10 AD3d 708 [2004]). £[W]here the language used in a restrictive covenant is equally susceptible of two interpretations, the less restrictive interpretation must be adopted’ (Ludwig v Chautauqua Shores Improvement Assn., 5 AD3d 1119, 1120 [2004]).”
*756 The Court in Greek Peak v Grodner (75 NY2d 981, 982 [1990]) held that “a party seeking to enforce a restriction on land use must prove, by clear and convincing evidence, the scope, as well as the existence, of the restriction.”
In Kem Cleaners v Shaker Pine (217 AD2d 787, 788 [3d Dept 1995]), it was stated that where a “lease has express provisions which limit and restrict the use of a building to a specific purpose, such provisions will be given effect . . . [but] [s]ince such limitations are not generally favored, they will not be extended by implication beyond the terms of the restriction and we must therefore glean the intent of the parties by an examination of the entire lease agreement.”
In a case which each of the parties contends supports its position, Herman Miller, Inc. v Thom Rock Realty Co., L.P. (46 F3d 183 [2d Cir 1995]), the landlord covenanted in the subject lease that the center it was developing “shall be constructed as a first class commercial building intended to be used for showrooms and other related uses.” (At 185.) The plaintiff tenant’s lease, similar to the leases of all other tenants in the center, provided that it could use the premises “only for showroom display and sale of contract furniture.” (Id.) When an economic downturn caused other furniture dealers to leave the center and the defendant landlord commenced leasing space to tenants engaged in other businesses, plaintiff instituted action seeking a declaration that it is relieved of its lease obligations and entitled to damages. The court, applying New York law, initially observed that “[u]nless the language of the lease makes it clear that a restriction is intended, the language is viewed simply as descriptive of the use a party may make of the premises, and not as a limitation on that use,” and stated that the aforesaid covenant of the landlord “standing alone, does not expressly and explicitly convey the intent to restrict the landlord’s use of the property.” (At 186-187.) However, the court found that the fact that said restriction on use was present in the leases of all of the other tenants in the center (other than a restaurant and copy center) demonstrated the center’s intended use “as an exclusive showroom center for the contract furniture industry.” (At 187.) Also, in order to create traffic beneficial to other tenants, the leases required the premises to be open for business during all of the center’s operating hours, with a liquidated damage provision if the tenant failed to comply. Based on these and other provisions of the lease, the Second Circuit concluded that the said landlord’s covenant “cannot be read as merely descriptive *757 . . . , [but rather that it] is a restrictive use covenant restricting [the landlord] from leasing Center space to any tenants outside the contract furniture showroom business” (id.).
Coming to the facts in the case at bar, it is acknowledged that the phenomenon of residential living on Wall Street is of very recent vintage (transcript at 68-69), and that such use clearly was not in the minds of the parties when the subject clause was first inserted in the lease in 1973. Moreover, there is no provision in this 77-page single-spaced printed lease specifically permitting or prohibiting a conversion for such use. The purported restricted use clause does not appear in section 3 dealing with the permitted use of the premises, which authorizes plaintiff to “use and occupy the Demised Premises for general office uses for the practice of law and related business consulting and for no other purpose whatsoever,” although plaintiff is permitted to construct a lunchroom not exceeding 1,500 square feet. Rather, the purported restrictive covenant appears among seven pages of detailed provisions dealing with how rent escalations are to be calculated based on the landlord’s increases in operating expenses. There is no proof as to any use limitation contained in any other tenant’s lease. Without deciding, a strong argument is presented by defendant, following the Second Circuit decision in Herman Miller, that section 9E standing alone “is descriptive of the use . . . and not as a limitation on that use.” The instant lease does not have provisions, as did the lease in that case, to clearly persuade the court that a restrictive use was intended, although plaintiff has shown that residential use of the lower floors will affect how the escalation provisions of section 9 will apply.
Considering the law cited above, the court concludes that plaintiff has not made a sufficiently adequate demonstration that it will prevail on the merits and that the balance of the equities tips in its favor. To grant the injunction would require the defendant to either abandon the conversion plan or continue to leave a significant amount of space vacant. On the equities the court does not find persuasive the argument set forth in the affirmation of Norman Flitt, dated February 8, 2005, that “[t]enant’s clients have, for many years, developed a perception of Tenant’s Wall Street operation as a ‘first-class pin-striped’ affair in a top flight office building in the Manhattan Financial District . . . [and if] Tenant’s clients are now to be exposed to numerous residential tenants in casual clothes and jogging suits, pushing prams and carting groceries, this perception will either *758 be altogether lost or substantially diluted” (11 47). On the issue of segregating the residential tenants from the commercial tenants, at oral argument it was not clear whether plaintiff desired separate entrances or that the lobby remain as is.
Regarding the provisions of section 54 of the lease, requiring the landlord to offer to lease vacant contiguous space to the tenant, it appears that two thirds of the tenth floor has been vacant for over a year (transcript at 12), but the landlord has not offered that vacant space to tenant. If tenant wanted that space, it was entitled to make application to the court to require the landlord to make the appropriate offer, and it can still make such an application. If it desires contiguous space that in the future becomes vacant, it would, notwithstanding any amendment of the certificate of occupancy for residential use, be entitled under the lease to require the landlord to make the appropriate offer, in which case it would seem that if tenant accepts the offer the landlord would be required to make the necessary renovations and apply to amend the certificate to again permit commercial occupancy of the space offered.
In conclusion, the court finds that plaintiff has not demonstrated its entitlement to preliminarily enjoin a conversion of the premises and thus denies its motion. This is without prejudice to any future application by plaintiff to enjoin any aspect of the conversion that it believes violates any specific provision of its lease. Further, the court again advises the parties that upon request it will grant an immediate trial of this action upon the filing of a note of issue.